# United States Court of Appeals
## For the First Circuit

No. 04-1617

UNITED STATES OF AMERICA,

Appellee,

v.

JOANNE RICHARDSON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]
[Hon. Reginald C. Lindsay, U.S. District Judge]
[Hon. William G. Young, U.S. District Judge]

Before

Selya, Circuit Judge,
Campbell, Senior Circuit Judge,
and Lipez, Circuit Judge.

Robert M. Andalman, with whom Jeremy D. Margolis, Sonnenschein Nath & Rosenthal LLP, A. John Pappalardo, Evan Georgopoulos, and Greenberg Traurig LLP were on brief, for appellant.
Susan G. Winkler, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, and Michael K. Loucks, Assistant United States Attorney, were on brief, for appellee.

August 30, 2005

**LIPEZ, Circuit Judge**.  Defendant-appellant Joanne Richardson appeals her conviction under 18 U.S.C. § 1623 for making false statements during immunized testimony before a grand jury investigating allegations of Medicare/Medicaid fraud.  Richardson first contends that the district court erroneously denied her motion to dismiss the indictment because her trial took place after the deadline imposed by the Speedy Trial Act, 18 U.S.C. §§ 1361-74 ("STA").  Next, Richardson asserts that at least one of the nineteen false statements charged against her in a single count of perjury advances a theory of conviction that is contrary to law, requiring that we vacate the jury's general verdict because it may have rested on an illegal ground.  Finally, Richardson challenges the court's admission of allegedly irrelevant and unduly prejudicial evidence at trial.  We reject all of these claims and affirm Richardson's perjury conviction.

## I. BACKGROUND

### A.        Grand Jury Investigation and Indictment

We set forth the facts "in the light most flattering to the government's theory of the case, consistent with record support."  United States v. Sebaggala, 256 F.3d 59, 62 (1st Cir. 2001).  From about 1997 to 2000, Richardson was employed as a Regional Account Manager for TAP Pharmaceuticals Inc. ("TAP"), which manufactures, among other drugs, Lupron, a prescription drug used in the treatment of prostate cancer.  Richardson was

-2-

responsible for maintaining relationships with institutional and managed care customers, including, in 1997, the Lahey Clinic in Burlington, Massachusetts.

In 1999-2000, the government convened a grand jury to investigate allegations that, in violation of federal statutes, TAP and some of its employees had provided "things of value," including educational grants and free items, (1) as an inducement to certain customers to purchase and prescribe TAP products and/or (2) as a hidden discount to those customers, which allowed TAP to pay reduced rebates to state Medicaid programs based on an artificially inflated invoice or contract price. See 42 U.S.C. § 1320a-7b(b) (prohibiting the offering or paying of and the solicitation or receipt of remuneration "in cash or in kind" in exchange for making certain referrals or for engaging in certain transactions "for which payment may be made in whole or in part under a Federal health care program"); id. § 1396r-8(c)(1)(A), (C) (providing for payment of rebates by drug manufacturers to state Medicaid programs based on difference between "average manufacturer price" and "the lowest price available from the manufacturer during the rebate period").

Richardson testified before the grand jury pursuant to an order of immunity on October 31, 2000 and December 19, 2000. In response to questioning about her discussions with Lahey Clinic representatives and TAP employees in 1997 regarding renewal of

Lahey's contract with TAP for the clinic's Lupron purchases, Richardson denied that she had ever offered or discussed offering things of value to Lahey Clinic, in her words, "as a way of reducing [Lupron's] price outside of a contract form."

On June 25, 2002, Richardson was indicted on one count of making false statements before a grand jury, 18 U.S.C. § 1623 (Count One),[1] and one count of obstruction of justice, id. § 1503 (Count Two),[2] based on her grand jury testimony of December 19, 2000. On October 31, 2002, the grand jury returned a superseding indictment amending Count One, re-alleging Count Two, and adding one count each of perjury and obstruction of justice (Counts Three and Four) based on a statement Richardson had made in a sworn declaration submitted to the court on September 24, 2002 in opposition to the government's motion to disqualify her defense counsel.

As amended, Count One alleged that, contrary to nineteen statements she made before the grand jury during her December 19, 2000 grand jury testimony, Richardson had

---

[1]18 U.S.C. § 1623(a) provides, in relevant part: "Whoever under oath . . . in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration . . . shall be fined under this title or imprisoned not more than five years, or both."

[2]18 U.S.C. § 1503(a) prohibits, among other things, a person from "corruptly . . . endeavor[ing] to influence, obstruct, or impede[] the due administration of justice . . . ."

-4-

> discussed with, offered[,] and provided to Lahey Clinic things of value outside the written contract as a way of making Lupron cheaper, . . . to help make up the difference between the price of Lupron and the price of Zoladex, [a competing drug], [and] as an inducement to the Lahey Clinic and some of its employees to . . . renew[] the contract with TAP and . . . to purchase Lupron for patients being treated in the Clinic's facilities;

and that Richardson had "discussed those arrangements with other[] employees at TAP."[3] Count One further alleged that "such things of value includ[ed] golf outings, research support, educational grants, free or nominally priced goods, and other items."

B.      **Pre-Trial through Post-Trial Proceedings**

Richardson moved to dismiss all four counts in the superseding indictment on March 7, 2003, arguing with respect to Count One that the perjury charges against her were insupportable as a matter of law because her statements before the grand jury were literally true, the indictment took those statements out of context, and her statements were made in response to the prosecutor's fundamentally ambiguous questions during the grand jury colloquy. Judge Stearns heard argument and took the motion under advisement on May 29, 2003.[4]

---

[3]The nineteen allegedly false statements charged in Count One of the superseding indictment are reproduced in Appendix A.

[4]We identify the four different district court judges involved in this case at various stages solely to prevent confusion over the chronology of the proceedings.

-5-

On August 11, 2003, one week before Richardson's trial was scheduled to begin, Judge Stearns, who had not yet ruled on Richardson's motion to dismiss the superseding indictment, recused himself.  On August 13, 2003, the case was reassigned to Judge Wolf, who immediately recused himself, and then to Judge Lindsay.  During the parties' first appearance before Judge Lindsay on September 22, 2003, Richardson requested a trial date, noting that the time period for trial permitted by the STA either had already expired or was due to expire.  Judge Lindsay stated that his trial calendar was booked through much of January, with the exception of the week of October 14, 2003.  Richardson acknowledged that an October trial date would leave too little time for Judge Lindsay to decide her motion to dismiss the superseding indictment.  Judge Lindsay therefore declined to set a trial date.

On October 16, 2003, Judge Lindsay denied Richardson's motion to dismiss the superseding indictment.  When the parties appeared before Judge Lindsay again on November 17, 2003, he inquired about the speedy trial status of the case.  The government stated that the docket showed no ruling by the court on Richardson's objections to a magistrate judge's order denying her motion to strike material from the government's opposition to her motion to dismiss the superseding indictment.  Richardson reminded the court and the government that Judge Lindsay had declared the matter to be moot in his October 16, 2003 decision because he had

-6-

excluded the material subject to Richardson's motion to strike from his consideration of her motion to dismiss the superseding indictment. As a result, no motions had been pending since late October.

The government then requested a trial date of January 19, 2004 because its chosen trial attorney was already engaged in another trial expected to run through part of December. Richardson indicated her readiness for an immediate trial. Judge Lindsay then stated: "there are two problems, one is that -- one of the counsel for the government is not ready because he's engaged elsewhere. And I have two criminal cases preceding this one in December." He concluded: "if we are impinging on [Richardson's speedy trial] rights, . . . then I'm going to have to refer this to another judge who can try it before January 19th," even if a different government attorney would have to try the case. Richardson again requested an immediate trial and asked that the case be reassigned quickly.

The government protested, predicting that "if we end up being [reassigned] to another judge, we'll be even later than January 19th." Judge Lindsay then accepted the government's suggestion that the government submit its calculation of the number of days remaining on the speedy trial clock so that Judge Lindsay could determine whether his earliest available trial date of January 19, 2004 would satisfy the requirements of the STA, or whether the case would instead have to be reassigned to another

-7-

judge.  Accordingly, Judge Lindsay requested that the government "report to my clerk" by noon the next day on the speedy trial status of the case.

The government timely filed its report, captioned a "Motion to Set a Trial Date of January 19 and for Excludable Delay for the Period Between November 17, 2003 and January 19, 2004," in which it calculated that the STA required Richardson's trial to "commence on or before December 18, 2003."  The government nevertheless requested that the court schedule trial for January 19, 2004 and exclude the period of time between November 17, 2003 and January 19, 2004 from the speedy trial clock as a continuance in the interest of justice pursuant to 18 U.S.C. § 3161(h)(8)(A).[5]

---

[5]18 U.S.C. § 3161(h)(8)(A) requires the exclusion from the speedy trial clock of "[a]ny period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial," provided that the court "sets forth, in the record of the case, either orally or in writing," its reasons for so finding.  "The factors, among others, which a judge shall consider in determining whether to grant a continuance under subparagraph (A) of this paragraph in any case" are set forth in 18 U.S.C. § 1361(h)(8)(B)(i)-(iv):

> (i) Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice.

> (ii) Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of

-8-

As grounds for the continuance, the government asserted that: (1) a trial date earlier than January 19, 2004 would "unreasonably deny . . . the Government continuity of counsel" because its chosen trial attorney had been involved since mid-October in another trial that was unlikely to end before December 10, 2003, justifying a continuance for that period of time; (2) the court could "require the parties to file any motions in limine by [November 24,

> novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by [18 U.S.C. § 3161].
>
> (iii) Whether, in a case in which arrest precedes indictment, delay in the filing of the indictment is caused because the arrest occurs at a time such that it is unreasonable to expect return and filing of the indictment within the period specified in section 3161(b), or because the facts upon which the grand jury must base its determination are unusual or complex.
>
> (iv) Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence.

Finally, 18 U.S.C. § 3161(h)(8)(C) provides that "[n]o continuance under subparagraph (A) of this paragraph shall be granted because of general congestion of the court's calendar, or lack of diligent preparation or failure to obtain available witnesses on the part of the attorney for the Government."

2003] . . . as a legitimate case management tool," thereby tolling the STA clock where "the defendant is likely to have such motions"; and (3) because it was unlikely that the case could be reassigned to another judge who could schedule the case for trial on or before December 18, 2003, "any transfer to another judge in this district will likely result in a miscarriage of justice because the case will probably have to be dismissed without prejudice due to a violation of the [STA]."

Upon the November 19, 2003 request of Judge Lindsay's clerk, Richardson submitted a letter to the court on November 20, 2003 addressing the "impact under the [STA] of the Government's November 18 filing." In the letter, Richardson disputed the government's STA calculation and argued that November 20, 2003 was the last day on which a trial could begin in compliance with the STA. Richardson also asserted that despite its caption, the government's report was not a "motion" whose filing on November 18, 2003 operated to toll the speedy trial clock pursuant to 18 U.S.C. § 3161(h)(1)(F),[6] but was instead a mere status report that "acknowledged that the first date on which the Court could try the case [January 19, 2004] indeed present[s] problems under the [STA], even by the Government's calculation." In Richardson's view, the

---

[6]18 U.S.C. § 3161(h)(1)(F) requires the exclusion from the speedy trial clock of any period of "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion."

-10-

government's attempt to characterize its filing as a motion was a pretext for avoiding the STA's requirements.

The government filed a reply to Richardson's letter on November 24, 2003 contesting Richardson's STA calculation and reiterating the arguments made in its November 18, 2003 filing. Richardson filed a "Memorandum in Opposition" the next day, November 25, 2003, seeking dismissal of the indictment with prejudice for violation of the STA. Without formally responding to any of the parties' papers filed between November 18 and November 25, 2003, and without determining how many days, if any, remained on the speedy trial clock, Judge Lindsay had the case reassigned to a fourth judge on December 1, 2003.[7]

When the parties appeared before Judge Young that same day, December 1, 2003, Richardson maintained that the time period within which the STA required her trial to begin had expired on November 20, 2003. Judge Young stated that he thought the speedy trial clock had not yet expired, but was about to. Although he offered to empanel a jury on December 8, 2003, he advised the parties that his schedule that week would not permit an uninterrupted trial. In the alternative, Judge Young offered to set a trial date of January 5, 2004 and to exclude the time between

---

[7]Judge Lindsay apparently utilized "a new procedure" through which the "case [could] be redrawn from a pool of those judges indicating the matter could be tried on an expedited basis." United States v. Richardson, 324 F. Supp. 2d 339, 341 (D. Mass. 2004) (Young, J.).

December 8, 2003, and January 5, 2004 as a continuance in the interest of justice under 18 U.S.C. § 3161(h)(8)(A), without prejudice to Richardson's right to seek dismissal of the indictment under the STA on the theory that the speedy trial clock had expired on November 20, 2003. The parties eventually agreed to set a trial date of January 12, 2004 and to exclude the time between December 8, 2003 and January 12, 2004 as a continuance in the interest of justice.[8]

On December 5, 2003, Richardson renewed her motion to dismiss the superseding indictment, reiterating her previous arguments that all of the charges against her were facially insufficient. On December 16, 2003, continuing to press her claim that the speedy trial clock had expired on November 20, 2003, Richardson moved to dismiss the indictment with prejudice for violation of the STA. On that same day, the government filed a "Further Submission on Speedy Trial Act Issues" in which it informed the court that it had miscalculated the number of days that had run on the speedy trial clock in its November 18, 2003 filing, and that, as of November 17, 2003, the STA required Richardson's trial to begin no later than December 3, not December 18, 2003.

---

[8]Appendix B sets forth a timeline of the dates and filings relevant to the STA calculation.

The government agreed to dismiss Counts Three and Four of the superseding indictment on December 17, 2003. On December 29, 2003, Richardson filed a motion in limine seeking to exclude allegedly irrelevant and unduly prejudicial evidence. On January 12, 2004, the date of trial, the court denied Richardson's motion to dismiss the indictment on STA grounds. The court also denied her motion in limine without prejudice.

Richardson's trial took place from January 12, 2004 through January 23, 2004. At the close of the government's evidence, Richardson moved for an acquittal under Fed. R. Crim. P. 29. The court permitted the trial to proceed, and Richardson presented evidence in her defense. On January 23, 2004, the jury returned a general verdict finding Richardson guilty of perjury as charged in Count One, but acquitting her of obstruction of justice as charged in Count Two. After receiving an extension of time, Richardson filed a motion for acquittal notwithstanding the jury verdict on February 10, 2004, arguing that at least one of the nineteen allegedly false statements forming a possible ground for the guilty verdict was legally insupportable. The court denied the motion after oral argument on March 16, 2004, reserving the right to reconsider its decision, as well as Richardson's oral motion for a new trial, while expressly stating that it made no promise of any further decision.

On April 29, 2004, the court sentenced Richardson to six months of imprisonment, to be followed by two years of supervised release (including four months of home confinement), a fine of $3,000, and a special monetary assessment of $100. The court entered a final judgment of conviction on April 30, 2004, and Richardson timely appealed. On May 11, 2004, the court, citing Richardson's STA claim, allowed her motion to stay execution of her sentence pending appeal. See 18 U.S.C. § 3143 (providing for detention pending appeal except where judicial officer finds that appeal is not for purposes of delay and raises a "substantial question of law . . . likely to result" in a different disposition). On July 13, 2004, the court issued a memorandum explaining its reasons for denying Richardson's motion to dismiss the indictment on STA grounds. See United States v. Richardson, 324 F. Supp. 2d 339 (D. Mass. 2004).

## II. THE SPEEDY TRIAL ACT

The STA provides that the trial of a defendant charged by indictment "shall commence within seventy days from the filing date (and making public) of the . . . indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1). This requirement reflects the Act's purpose of protecting both a defendant's private interest and the broader public interest "in the fair -- but expeditious -- trial of

-14-

criminal cases." United States v. Hastings, 847 F.2d 920, 924 (1st Cir. 1988).[9]  If a defendant's trial begins after the seventy-day time period has elapsed, the STA requires the court, "on motion of the defendant," to dismiss the indictment, either with or without prejudice.  18 U.S.C. § 3162(a)(2); see also United States v. Barnes 159 F.3d 4, 16-18 (1st Cir. 1998) (discussing factors to be considered).  However, in calculating the seventy-day period within which a trial must commence, the STA "mandates the exclusion of certain periods of delay." United States v. Salimonu, 182 F.3d 63, 67 (1st Cir. 1999); see 18 U.S.C. § 3161(h)(1)-(9).  Among the periods of delay that must be excluded is "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion."  18 U.S.C. § 3161(h)(1)(F).

For purposes of this appeal, the parties do not dispute that by November 17, 2003, the day of the second pre-trial status conference before Judge Lindsay, sixty-seven out of seventy non-excludable days had run on the speedy trial clock.  The government thus does not press its arguments, raised below, that, as of November 17, 2003, the STA permitted Richardson's trial to begin as late as December 18, 2003 (as stated in the government's November 18, 2003 filing) or on or before December 3, 2003 (as stated in the

[9]The STA "increases a defendant's speedy trial safeguards beyond the constitutional minima." Hastings, 847 F.2d at 923 n.4.

government's December 16, 2003 "Further Submission on Speedy Trial Act Issues").  Richardson, for her part, concedes that if the speedy trial clock did not expire on November 20, 2003, she was tried within the seventy-day period allowed by the STA.

The parties' disagreement is therefore confined to the question whether the government's filing of November 18, 2003 was a "motion" within the meaning of 18 U.S.C. § 3161(h)(1)(F), which operated to toll the speedy trial clock "from the filing of the motion through [its] . . . prompt disposition."[10]  Richardson argues that the government's November 18, 2003 filing was nothing more than a status report responding to Judge Lindsay's request for information that did not toll the speedy trial clock, which expired two days later without the commencement of her trial. Alternatively, Richardson argues that even if the government's filing otherwise qualified as a motion, it did not operate to toll the speedy trial clock because it was filed as a pretext to avoid the consequences of an STA violation.  To permit tolling under these circumstances, Richardson maintains, would frustrate the purposes of the STA.  The government takes the position that it filed a legitimate motion for a continuance in the interest of justice, without pretext, whose filing tolled the clock until the case was reassigned from Judge Lindsay to Judge Young on December

---

[10]Richardson does not argue that, if the government's November 18, 2003 filing qualifies as a motion, the court exceeded the permissible period of excludable time for disposing of the motion.

-16-

1, 2003.  By the government's count, only one additional non-excludable day, December 2, 2003, elapsed on the speedy trial clock before Richardson's trial began on January 12, 2004 with two days to spare.[11]

In his July 13, 2004 memorandum explaining his reasons for denying Richardson's motion to dismiss the indictment on STA grounds, Judge Young recognized Richardson's "frustration with the timing of the Government's filing" and acknowledged that "this is a close call."  Richardson, 324 F. Supp. 2d at 342.  He nevertheless concluded that the government's filing of November 18, 2003 qualified as a legitimate, non-pretextual motion that tolled the speedy trial clock under 18 U.S.C. § 3161(h)(1)(F).  Judge Young explained that the government's filing

> request[ed] . . . a continuance until January 19, 2004 and [exclusion of] the intervening delay instead of [having the case reassigned] to another judge so that it could be put to trial before December 18, 2003.  The Government put forth three reasons why the court should grant the continuance and exclude the delay, citing relevant provisions of the [STA].  On its face, the Government's filing appeared to be a genuine motion.  The motion also appeared to be sufficiently straightforward as to warrant action without a hearing.  The last brief relating to the Government's motion was [the Memorandum of

_____

[11]The government filed a motion in limine on December 3, 2003, which overlapped with the filing of other pretrial motions that were decided on January 12, 2004.  The parties also agreed on December 1, 2003 to exclude the period of time from December 8, 2003 through January 12, 2004 as a continuance in the interest of justice.  See infra Appendix B.

-17-

Opposition] filed by Richardson on November 25, 2003, and, although Judge Lindsay never issued an order relating to the motion, he essentially denied it when he promptly had the case redrawn on December 1, 2003, instead of granting the continuance and excluding the delay.

Richardson, 324 F. Supp. 2d at 342 (citations omitted).[12]  Judge Young thus determined that Judge Lindsay effectively denied the government's legitimately filed motion for a continuance when he had the case reassigned to Judge Young on December 1, 2003.  As a result, the filing of the motion tolled the speedy trial clock from November 18, 2003 through December 1, 2003.  Accordingly, Judge Young agreed with the government's position that the disputed period of time was excludable from the speedy trial clock and denied Richardson's motion to dismiss the indictment on STA grounds.

The question whether the government's filing was a "motion" within the meaning of 18 U.S.C. § 3161(h)(1)(F) is a question of law subject to de novo review.  Cf. United States v. Staula, 80 F.3d 596, 600 (1st Cir. 1996) (reviewing de novo question whether colloquy qualifies as a "hearing" within the meaning of 18 U.S.C. § 3161(h)(1)(F)).  We review for clear error

_____

[12]Judge Young also noted that "the [STA] separately provides for disciplinary action against attorneys who file frivolous motions for the purpose of delay" under 18 U.S.C. 3162(b). Richardson, 324 F. Supp. 2d at 342 n.3.  Because Richardson did not seek sanctions against the government's attorneys, Judge Young declined to comment on "whether the Government's motion qualified for such punishment." Id.

the district court's factual findings on the question whether the government's filing was merely a pretext to avoid dismissal of the indictment under the STA. See United States v. Zayas, 876 F.2d 1057, 1058 (1st Cir. 1989) (reviewing factual determination that jury empanelment was not pretextual for clear error).

"[W]e have read the term 'pretrial motion' broadly to encompass all manner of motions" for purposes of tolling the speedy trial clock, "ranging from informal requests for laboratory reports to 'implied' requests for a new trial date." Barnes, 159 F.3d at 11 (citations omitted); see also United States v. Arbelaez, 7 F.3d 344, 348 (3d Cir. 1993) (defendant's letter to court qualifies as motion tolling speedy trial clock where "the government, in good faith, treated the letter as a motion" despite court's refusal to consider the filing until resubmitted in proper form). But see United States v. Brown, 285 F.3d 959, 961 (11th Cir. 2002) (per curiam) (document filed by government that "served the function of [regular] status reports required by [a] local rule" but also requested that the court set a trial date does not constitute motion that tolls speedy trial clock). The district court accurately characterized the government's November 18, 2003 filing, which not only reported the government's calculation of the number of days remaining on the speedy trial clock but also sought relief in the form of a continuance in the interest of justice pursuant to

18 U.S.C. § 3161(h)(8)(A), as a motion that tolled the speedy trial clock pursuant to 18 U.S.C. § 3161(h)(1)(F).

The statutory grounds for exclusion of time from the speedy trial clock "are designed to take account of specific and recurring periods of delay which often occur in criminal cases; they are not to be used either to undermine the time limits established by the Act, or to subvert the very purpose the Act was designed to fulfill." Henderson v. United States, 476 U.S. 321, 333 (1986) (White, J., dissenting). Accordingly, we have repeatedly cautioned that neither counsel nor district courts may employ measures for excluding time from the speedy trial clock that impermissibly frustrate the STA's purpose of protecting the shared interest of criminal defendants and the public in "bringing criminal charges to the bar of justice as promptly as practicable." Hastings, 847 F.2d at 923. See, e.g., United States v. Scott, 270 F.3d 30, 56 (1st Cir. 2001) (period of delay not excludable where court's retroactive reasons for exclusion "would undermine the purposes of the [STA]"); Staula, 80 F.3d at 602 n.3 ("[W]e will not permit either the district court or the prosecution to jerry-build a 'hearing' in order to thwart the concinnous operation of the Speedy Trial Act."); United States v. Rodriguez, 63 F.3d 1159, 1165 (1st Cir. 1995) (declining to adopt "broad rule" requiring exclusion of "extended delay attributable solely to the

government's unexcused failure to comply with a court-ordered briefing schedule" because of "potential [for] abuse").

The record in this case supports Judge Young's determination that the government's facially valid motion was not filed as a pretext to avoid the consequences of an STA violation, but was filed for the legitimate purpose of seeking a continuance in the interest of justice. In particular, the motion justifiably sought a continuance to prevent the loss of continuity of counsel in the event the case was reassigned to a different judge for an earlier trial date.[13] The government's need for continuity of counsel is a valid statutory ground for granting a continuance in the interest of justice. See 18 U.S.C § 3161(h)(8)(B)(iv) (among factors court "shall consider" in determining whether ends of justice outweigh interests favoring speedy trial is whether failure to grant a continuance "would unreasonably deny the defendant or the Government continuity of counsel"); United States v. Scantleberry-Frank, 158 F.3d 612, 615 (1st Cir. 1998) (excluding time period resulting from "continuance . . . granted to aid defense counsel, and maintain continuity of counsel").

---

[13]We do not address the other two grounds raised in the government's November 18, 2003 motion in support of a continuance in the interest of justice: (1) that the court could "require the parties to file any motions in limine by [November 24, 2003] . . . as a legitimate case management tool" and (2) that "any transfer to another judge in this district will likely result in a miscarriage of justice because the case will probably have to be dismissed without prejudice due to a violation of the [STA]."

-21-

Richardson does not dispute that the government's attorney was in fact unavailable because he was engaged in another trial during much of December.[14] She points out, however, that while continuity of counsel is an express statutory ground for a continuance in the interest of justice, the STA explicitly prohibits a court from granting such a continuance "because of general congestion of the court's calendar." 18 U.S.C. § 3161(h)(8)(C). The events in this case, Richardson argues, demonstrate that although the government cited continuity of counsel as a reason to grant a continuance in the interest of justice, the real reason a continuance was necessary was because Judge Lindsay's trial schedule was full.[15]

The record reflects that Judge Lindsay notified the parties, both during the November 17, 2003 status conference and during the earlier September 22, 2003 conference, that his trial calendar was filled through most of January. However, the record also shows that during the November 17, 2003 status conference -- before either of the parties had submitted their speedy trial

---

[14]A different government attorney eventually tried Richardson's case in January.

[15]Richardson argues that the government's motion was pretextual because the court could not grant a continuance in the interest of justice in order to postpone a trial date that had not yet been set and, more importantly, could not be set within the seventy-day period allotted by the STA. However, Richardson cites no authority, and we have found none, for the proposition that a trial date must first be set before a court may grant "a continuance in the proceeding," 18 U.S.C. § 3161(h)(8)(B)(i).

calculations -- the government identified its chosen trial team and apprised the court of one attorney's unavailability for trial before January 19, 2004 because of his involvement in an ongoing trial expected to last for several more weeks.  The schedule conflicts of the court and the government's counsel thus coincided.  As Judge Lindsay stated, "since I have two other cases with speedy trial problems preceding this one in December, it turns out that the date [the government] suggest[s,] [January 19, 2004,] is the best date for me."  When Richardson requested an immediate trial, Judge Lindsay responded that if a January trial date would not comply with the requirements of the STA, he would have the case randomly reassigned to a different judge who might be able to commence trial before the speedy trial clock expired.

Given the circumstances, the district court committed no clear error in determining that, despite the timing of its motion, the government legitimately sought relief from having the case reassigned to a different judge in the form of a continuance in the interest of justice.  The government recognized that even if the case were reassigned to a judge who could try the case sooner than January 19, 2004, thereby solving Judge Lindsay's scheduling problem, its own need for continuity of counsel would remain, as one of its chosen attorneys would still be unavailable for trial.  As Judge Young found, the government properly "request[ed] . . . a continuance until January 19, 2004 and [exclusion of] the

intervening delay instead of [having the case reassigned] to another judge so that it could be put to trial before December 18, 2003." Richardson, 324 F. Supp. 2d at 342. As Judge Young also found, Judge Lindsay "essentially denied [the government's request] when he promptly had the case redrawn on December 1, 2003, instead of granting the continuance and excluding the delay." Id. While Judge Lindsay ultimately denied the government's motion, it was a motion nonetheless within the meaning of the STA.

Accordingly, Judge Young correctly concluded that the government's filing of November 18, 2003 qualified as a motion that tolled the speedy trial clock "from the filing of the motion" on November 18, 2003 through its "prompt disposition" when the case was reassigned on December 1, 2003. 18 U.S.C. § 3161(h)(1)(F). As a result, when Richardson's trial began on January 12, 2004, only sixty-eight days had elapsed on the speedy trial clock, and Judge Young properly denied her motion to dismiss the indictment on STA grounds.

### III. THE PERJURY CONVICTION

#### A. Validity of a General Verdict

The district court instructed the jury that in order to convict Richardson of perjury on Count One, its members had to agree unanimously that the same false statement or statements amounted to perjury beyond a reasonable doubt. See United States v. Glantz, 847 F.2d 1, 10 (1st Cir. 1988) (no error in jury

-24-

"instructions [that] could only be interpreted by the jury to mean that the defendant must be acquitted on the count unless the entire jury believed beyond a reasonable doubt that the appellant was guilty of one specific act of perjury alleged in that count"). Because the court submitted the case to the jury for a general verdict instead of a special verdict, it is impossible to know which one or more of the nineteen false statements it found, unanimously and beyond a reasonable doubt, to constitute perjury, and which statements (if any) it determined to fall short of that standard when it found Richardson guilty of perjury on Count One.

Richardson argues that the jury's guilty verdict must be vacated because at least one of the nineteen alternate grounds submitted by the government is legally insupportable, and the jury's verdict may have rested on such an invalid ground. Richardson acknowledges that, ordinarily, "a general jury verdict [is] valid so long as it [is] legally supportable on one of the submitted grounds -- even though that [gives] no assurance that a valid ground, rather than an invalid one, was actually the basis for the jury's action." Griffin v. United States, 502 U.S. 46, 49 (1991). However, a guilty verdict may rest on an invalid ground either because it is based on "evidence that no reasonable person could regard as sufficient," id. at 59, or because it advances "a particular theory of conviction . . . [that] is contrary to law," id. While jurors, in a criminal case, are "well equipped to

analyze the evidence" in order to avoid resting a guilty verdict on a "factually inadequate" theory, they "are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law." Id. (emphasis added). Accordingly, where a general verdict may rest on a ground that is invalid because the theory of conviction is contrary to law -- as opposed to a ground that is invalid because the evidence supporting it is insufficient as a matter of law -- the verdict must be set aside despite the existence of an alternate, legally valid ground of conviction. Id.; see also United States v. Nieves-Burgos, 62 F.3d 431, 434-36 (1st Cir. 1995).

Richardson argues that at least one of the nineteen false statements alleged in Count One of the indictment advances a legally erroneous theory of perjury, requiring us to vacate her conviction. See United States v. Boots, 80 F.3d 580, 589 (1st Cir. 1996) (general verdict that may have been grounded on legally erroneous theory requires setting aside verdict on all grounds), overruled in part by Pasquantino v. United States, 125 S. Ct. 1766 (2005); cf. United States v. Lighte, 782 F.2d 367, 377 (2d Cir. 1986) (remanding for new trial on one count of perjury alleging multiple false statements without determining whether legal defect resulted from insufficiency of evidence or legally erroneous theory of conviction). We review this question of law de novo. United States v. Ferrario-Pozzi, 368 F.3d 5, 8 (1st Cir. 2004).

**B.       Validity of Government's Theories of Conviction**

The statute under which Richardson was convicted, 18 U.S.C. § 1623(a), prohibits a grand jury witness from "knowingly mak[ing] any false material declaration" under oath during the colloquy. Richardson does not dispute that she testified under oath before the grand jury, nor that her allegedly false statements were material to the grand jury investigation. Rather, she argues that the government's theories of perjury are contrary to law because her statements are either literally true or were made in response to fundamentally ambiguous questions. In either case, Richardson argues, she could not have made statements with the knowledge that they were false.

In general, "[t]he determination as to the defendant's state of mind -- [her] belief in the untruthfulness of [her] statement -- is one which a jury is best equipped to perform." United States v. Reveron Martinez, 836 F.2d 684, 689 (1st Cir. 1988) (internal quotation marks omitted). Furthermore, because the falsity of a statement in many circumstances depends on the meaning of the question to which it responds, a jury may be required to examine "the question and answer . . . in the context of the investigation as a whole and the state of the defendant's knowledge." United States v. DeZarn, 157 F.3d 1042, 1048 (6th Cir. 1998). Richardson nevertheless maintains that her challenges go beyond assailing the sufficiency of the evidence before the jury

-27-

because several of the government's alternate theories of conviction are contrary to the strict requirements imposed by the law of perjury.

### 1. Literally True Statements

In <u>Bronston</u> v. <u>United States</u>, 409 U.S. 352 (1973), the Supreme Court set exacting standards for maintaining a perjury prosecution.[16] The Court recognized that "[u]nder the pressures and tensions of interrogation, it is not uncommon for the most earnest witnesses to give answers that are not entirely responsive. Sometimes the witness does not understand the question, or may in an excess of caution or apprehension read too much or too little into it." <u>Id.</u> at 358. Given this practical reality, "[t]he burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry." <u>Id.</u> at 360. Accordingly, "[p]recise questioning is imperative as a predicate for the offense of perjury." <u>Id.</u> at 362.

Despite these general pronouncements, the <u>Bronston</u> Court's holding was narrow. The Court decided only that a jury could not be allowed to consider a perjury charge where the allegedly false statement was "literally true but not responsive to the question asked and arguably misleading by negative

---

[16]<u>Bronston</u> construed the general perjury statute, 18 U.S.C. § 1621. Courts have applied <u>Bronston</u> to the related statute governing false statements before a grand jury or a court, 18 U.S.C. § 1623. <u>See</u> <u>Reveron Martinez</u>, 836 F.2d at 689.

-28-

implication." Id. at 353. The Court reasoned that "[a] jury should not be permitted to engage in conjecture whether an unresponsive answer, true and complete on its face, was intended to mislead or divert the examiner; the state of mind of the witness is relevant only to the extent that it bears on whether 'he does not believe [his answer] to be true.'" Id. at 359 (quoting 18 U.S.C. § 1621; alteration in original). Bronston thus requires dismissal of an indictment "where . . . the government hinges its charge on the false implications of a statement that is not alleged to be false in itself." United States v. Finucan, 708 F.2d 838, 848 (1st Cir. 1983).

Richardson, relying on Bronston, argues that several of the perjury charges against her are contrary to law because they allege the falsity of statements that are literally true. Bronston, however, is inapplicable to any of the false statements charged against Richardson. The government does not allege that any of Richardson's statements are facially true but "arguably misleading by negative implication," Bronston, 409 U.S. at 353, thereby evincing only her intent to "mislead or divert the examiner," id. at 359. Rather, the government alleges that Richardson knowingly made statements that are in direct conflict with facts the government alleges to be true, by denying that she committed acts the government maintains she in fact committed. See Glantz, 847 F.2d at 6 (Bronston's "literal truth" defense

-29-

inapplicable where "no claim is made that [defendant's] statement . . . was true but unresponsive to the question asked before the grand jury"). Whether or not the government's evidence was sufficient to prove the falsity of Richardson's statements, as well as that she knew her statements to be false when she made them, its theory of perjury is not contrary to law.

## 2.     Fundamentally Ambiguous Questions

Richardson also argues that several of the false statements alleged in Count One of the indictment advance theories of conviction that are contrary to the law of perjury because they were made in response to fundamentally ambiguous questions. "A question that is truly ambiguous or which affirmatively misleads the testifier can never provide a basis for a finding of perjury, as it could never be said that one intended to answer such a question untruthfully." DeZarn, 157 F.3d at 1049; see also United States v. Manapat, 928 F.2d 1097, 1101 (11th Cir. 1991) ("When the question that led to the allegedly false response is fundamentally ambiguous, we cannot allow juries to criminally convict a defendant based on their guess as to what the defendant was thinking at the time the response was made.").

By contrast, where a question is only arguably ambiguous, "it is for the jury to decide whether the defendant has committed perjury. In such a case there is an actual possibility that the defendant intended to and did in fact give a response that was

literally false." Finucan, 708 F.2d at 848 (citations omitted). In determining whether a statement made in response to an ambiguous question could be said to be false, "the context of the question and answer becomes critically important." United States v. Farmer, 137 F.3d 1265, 1269 (10th Cir. 1998); see also DeZarn, 157 F.3d at 1049 (jury must be allowed to consider "evidence of the context of the questioning which would establish that the [d]efendant -- despite the false premise of the question -- knew exactly what the questions meant and exactly what they were referring to").[17]

Because the meaning of a response to an ambiguous question may be highly context-specific, "[w]here a question . . . is only arguably ambiguous, courts reviewing perjury convictions have viewed the defense of ambiguity as an attack upon the sufficiency of the evidence." Farmer, 137 F.3d at 1269; see also Glantz, 847 F.2d at 6 (noting that perjury convictions are barred "for arguably untrue answers to vague or ambiguous questions when there is insufficient evidence of how they were understood by the witness"). Richardson maintains that a perjury conviction based on a response to a fundamentally ambiguous question not only rests on insufficient contextual evidence of the intended falsity of the response, but also advances a theory of conviction that is contrary to law. Even assuming this to be true, none of the questions

---

[17]Both a transcript and an audio recording of the grand jury colloquy were available to the jury during its deliberations.

Richardson identifies rises to the level of being fundamentally, rather than arguably, ambiguous.

"[T]o precisely define the point at which a question becomes fundamentally ambiguous, and thus not amenable to jury interpretation, is impossible." Farmer, 137 F.3d at 1269. Courts have nevertheless recognized that:

> A question is fundamentally ambiguous when it "is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony."

Lighte, 782 F.2d at 375 (quoting United States v. Lattimore, 127 F. Supp. 405, 410 (D.D.C.), aff'd per curiam by an equally divided court, 232 F.2d 334 (D.C. Cir. 1955)).

Richardson claims that several of the prosecutor's questions during the grand jury colloquy were fundamentally ambiguous because she and the prosecutor did not share the same understanding of the term "price" throughout the colloquy. Instead, she argues, the prosecutor injected insurmountable ambiguity into his questions by alternately using the word "price" to refer to (1) the amount TAP charged Lahey Clinic for Lupron "in the contract" and (2) the cost of Lupron to Lahey Clinic "in reality," that is, after subtracting the value of goods for which TAP, not Lahey Clinic, footed the bill.

-32-

The government's theory that TAP had engaged in health care fraud -- the focus of the grand jury investigation -- depended on the premise that TAP purposefully omitted from the written contract any cost savings it provided to Lahey Clinic in the form of things of value for which Lahey Clinic did not have to pay. Richardson asserts that if "price" refers only to the price of Lupron listed in the written contract between TAP and Lahey Clinic, her responses merely confirm the uncontested fact that no things of value were listed in the contract as offsets to the "price" listed therein. However, because the prosecutor sometimes used "price" to mean something different, namely, the actual cost of Lupron to Lahey Clinic after accounting for items TAP provided to the clinic free of charge, Richardson argues that it is impossible to tell whether she followed each of the prosecutor's shifts in meaning when she gave her responses.

In several of his questions during the grand jury colloquy, the prosecutor explicitly distinguished between the contract price of Lupron and the actual cost of Lupron. For example, in the question preceding statement A1 alleged in the indictment,[18] the prosecutor asked Richardson, "have you ever offered a customer or discussed with a customer giving them an

---

[18]Throughout this opinion, we refer to the false statements alleged in Count One, according to our own numbering system, as A1-A19, in the order in which they are set forth in the indictment. Only the statements highlighted in boldface are alleged to be false.

educational grant to give them <u>a lower price in reality</u> but not changing <u>the price in the contract</u>?" (emphases added). In her allegedly false statement A1, Richardson responded, "No, never outside of a contract." Similarly, in the question preceding statement A12, the prosecutor asked,

> Q. And were those part of the discussions with the folks at Lahey Clinic, that you might not be able to <u>reduce the price</u>, but you could give them some <u>support elsewhere</u>?

**A12. No that is not correct.**

(Emphases added.)

Immediately after Richardson's statement in A12, however, the prosecutor asked:

> Q. As a way of effecting a <u>reduction in price</u>?

**A13. No that was separate.**

(Emphasis added.) Richardson argues that the prosecutor's reference to "a reduction in price" in his follow-up question was fundamentally ambiguous because he could have been asking whether she discussed providing "support elsewhere" to Lahey Clinic that resulted not only in the reduction of the actual cost of Lupron to the clinic, but also in a reduction of the price of Lupron as listed in the contract.

Richardson's interpretation of the prosecutor's follow-up question is not plausible. First, the prosecutor had just stated his assumption that Richardson "might not be able to reduce the

-34-

price" in the contract, so that any additional "support" would necessarily have to be provided "elsewhere." Second, even if the prosecutor did intend to refer to the price as written in the contract in his follow-up question, the context of the exchange suggests a much more reasonable interpretation of the prosecutor's questions than the one Richardson advances. After asking Richardson whether she discussed giving Lahey Clinic "support elsewhere" because she could not "reduce the price" of Lupron that was written in the contract, the prosecutor immediately followed up the question by asking whether the provision of "support elsewhere" was a way of "effecting a reduction in [the] price" written in the contract, that is, as a way of reducing the price in effect without actually changing the written contract price. "[A] witness cannot twist the meaning of a question in his own mind into some totally unrecognizable shape and then hide behind it" by alleging its fundamental ambiguity. Reveron Martinez, 836 F.2d at 691.

The indictment alleges three other false statements made by Richardson, A2-A4, in response to questions in which the prosecutor used the word "price" without specifying whether he was referring to the price of Lupron listed in Lahey Clinic's written contract with TAP or to the actual cost of Lupron to Lahey Clinic after taking into account things of value that TAP provided to the clinic free of charge. The context of each exchange reveals that

any ambiguity in the questions was not fatal to a perjury charge.

Richardson made statement A2 during the following exchange:

> Q.      Have you ever had a customer tell you they needed a couple of hundred-thousand dollars more off of the price because Zoladex's price was so much less?
>
> A.      Yes. Customers have come before, saying that the competitor is less expensive, so can you lower your price? Yes.
>
> Q.      And in those conversations with customers, have you ever discussed with a customer giving them educational grants or nominal goods or research support <u>to make up the difference in price</u> between Lupron and Zoladex?

**A2.    No, never to make up the difference.**

(Emphasis added.) Based on the preceding discussion of Lupron's high cost relative to that of a competing drug, the prosecutor could reasonably be understood to be asking whether Richardson discussed giving a customer "educational grants or nominal goods or research support" as a hidden discount, that is, as a <u>substitute</u> for matching the competitor's price in the contract. While Richardson maintains that she understood the prosecutor to be asking only whether educational grants or nominal goods were listed in the contract to offset the price of Lupron stated therein, the prosecutor's question is again only arguably ambiguous.

The indictment further alleges the following false statements:

```
Q.      Did you ever do that with Lahey Clinic?
        Offer them educational grants to reduce
        the price on a contract?

A3.     No I did not.

Q.      Did you ever discuss that with them?

A4.     That customer had brought up some things
        that they would do, and it would be
        included in the contract, in order to
        bring the price closer together, but we
        did never do that.
```

Statements A3 and A4 respond to the prosecutor's questions whether

Richardson offered or discussed offering Lahey Clinic "educational

grants to reduce the price on a contract" (emphasis added).  While

the prosecutor sought to determine whether Richardson offered or

discussed offering Lahey Clinic educational grants instead of

reducing the price written in the contract, Richardson points out

that the phrase "on a contract" is not generally interpreted to

mean "outside a contract."  When read in context, however, the

prosecutor's questions continue a line of inquiry into whether TAP

provided financial support to Lahey Clinic that was not listed in

the written contract but was nevertheless part of the parties'

agreement regarding the clinic's Lupron purchases.[19]

        Because  each  of  the  prosecutor's  questions  that

Richardson characterizes as fundamentally ambiguous is, at most,

_____

        [19]Richardson argues that her statement in A4 that "we did never
do that" is literally true because TAP never did list any
additional financial support "in the contract."  Richardson's
argument goes only to the sufficiency of the evidence that
statement A4 was false, an issue we do not reach.

                            -37-

only arguably ambiguous, Richardson's claim that the corresponding perjury charges are contrary to law must fail.  We have reviewed each of the remaining false statements alleged in Count One of the indictment, and we reject the argument that any of them advance theories of conviction that are contrary to the law of perjury, requiring us to vacate Richardson's conviction.

On appeal, Richardson does not challenge the sufficiency of the evidence supporting each of the nineteen false statements charged against her (i.e., those that she does not identify as advancing legally erroneous theories of conviction).  As a result, she has forfeited any argument that not one of the nineteen charges against her is supported by adequate evidence.  See United States v. Mitchell, 85 F.3d 800, 812 (1st Cir. 1996) (defendant forfeited challenge to sufficiency of evidence supporting alternate ground of conviction through failure to develop argument).  Nonetheless, we have compared the charges in Count One of the indictment against the record evidence, including the transcripts and audio recordings of the grand jury colloquies that were submitted to the jury. Based on our review, we readily conclude that the evidence was sufficient to support not just one, but several, of the perjury charges against Richardson.[20]  See Reveron Martinez, 836 F.2d at

---

[20]By limiting our discussion of the sufficiency of the evidence to several of the allegedly false statements, we do not imply that the evidence was insufficient to support a guilty verdict on the other charged grounds.  Nor do we suggest that more than one ground was required to be supported by sufficient evidence in order for

689-90 (evidence sufficient to support conviction for knowingly made false statement where, "taking into account the totality of the evidence, direct and circumstantial, and giving due weight to the indirect evidence anent appellant's motive to falsify, the proof was adequate to underbrace a guilty verdict"). In particular, a reasonable jury could have inferred, based on the government's strong circumstantial evidence (including Richardson's own contemporaneous internal office memoranda and notes), that Richardson knew at the time she testified before the grand jury that the things of value that she offered or discussed offering to Lahey Clinic, and that she discussed with other TAP employees, were intended to provide the clinic with a hidden discount or incentive to renew its contract for Lupron, contrary to Richardson's statements in A1 and A8-A11. See infra Appendix A.

Because Richardson has not established that any of the charges against her was contrary to law, and because the evidence was sufficient to support at least one of the charges, Richardson's conviction for perjury must stand. See Nieves-Burgos, 62 F.3d at 436, 439 (affirming conviction where only one out of three grounds charged in single count was supported by sufficient evidence).

---

the guilty verdict to stand. We make the point about evidentiary sufficiency on several of the statements to dispel any notion that Richardson could have argued successfully that the general verdict should be vacated on the basis that there was insufficient evidence for all nineteen statements.

## IV. EVIDENTIARY RULINGS

Richardson challenges the district court's admission of two categories of evidence at trial. First, she contests the relevance of testimonial and documentary evidence tending to show that TAP provided free samples of Lupron worth $15,000 to Lahey Clinic after the clinic renewed its contract with TAP in October 1997. See Fed. R. Evid. 401, 402. Second, Richardson assails the admission of testimonial and documentary evidence concerning a government witness's plea agreement, in which the witness admitted conspiring to commit health care fraud, as irrelevant and unfairly prejudicial. See Fed. R. Evid. 401-403.

We review preserved challenges to a district court's evidentiary rulings regarding relevance and unfair prejudice for abuse of discretion. United States v. Otero-Mendez, 273 F.3d 46, 53 (1st Cir. 2001) ("In reviewing Rule 403 challenges, we are extremely deferential to the district court's determination."); United States v. Newton, 891 F.2d 944, 946 (1st Cir. 1989) ("[R]ulings on relevance and admissibility are reversible only for abuse of discretion."). However, because Richardson failed to raise a contemporaneous objection to the admission of testimonial evidence relating to the free Lupron samples after the denial without prejudice of her motion in limine, we review the court's decision to admit the testimony for plain error only. See United States v. Noah, 130 F.3d 490, 496 (1st Cir. 1997) (evidentiary

-40-

challenge on grounds of unfair prejudice ordinarily must be renewed in trial context in order to be preserved); <u>United States</u> v. <u>Kayne</u>, 90 F.3d 7, 11 (1st Cir. 1996) (reviewing unpreserved challenge to relevance of evidence for plain error).

**A.        Admissibility of Evidence Concerning Free Lupron Samples**

At trial, the government introduced the testimony of a TAP employee, Jennifer Weiler, who shared responsibility for the Lahey Clinic account.  Weiler testified that when Richardson stopped working with Lupron customers in late 1997 and passed on information about the Lahey Clinic account to her, Richardson told her that TAP owed Lahey Clinic fifty Lupron samples (which, at the contract price of $305 per dose, were worth more than $15,000) free of charge as part of Lahey Clinic's contract to purchase Lupron. Weiler also testified that she, Richardson, and a supervisor had delivered the free Lupron samples to Lahey Clinic in November 1997 and February 1998.  The government introduced documentary evidence in the form of nine sample cards signed by the clinic's physicians when they received the samples.  All of the sample cards bore a typewritten date of October 13, 1997, which, according to Richardson's notes and TAP's contract with Lahey Clinic, fell between the date on which Richardson presented a new contract to Lahey Clinic, September 29, 1997, and the signing of that contract on October 20, 1997.

The government also introduced the testimony of another TAP employee, Daniel Steiner, who confirmed that in February 1998 he had emailed a PowerPoint presentation to other TAP employees, including Richardson, explaining the restrictions on distribution of free drug samples to customers. A print-out of the presentation introduced into evidence includes the statement: "If MCO [managed-care organizations]/Hospitals ask for large quantities of samples to achieve a contract price - you must include these in the contract. Of course, this affects the per unit cost . . . ."

Federal Rule of Evidence 401 defines "relevant evidence" as evidence having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." "Evidence which is not relevant is not admissible." Fed. R. Evid. 402. Richardson argues that the evidence relating to the free Lupron samples was not relevant to the charges against her because the prosecutor never explicitly asked her any questions about the free samples during the grand jury colloquy. Richardson further argues that the evidence was irrelevant because the government failed to prove that the free Lupron samples had any effect on Lahey Clinic's bottom line, for example, by showing that the clinic had sold the samples it received free of charge to patients or insurers for a profit.

As the government argues, however, the evidence relating to the free Lupron samples was relevant to prove that the following statement made by Richardson during her grand jury testimony was false:

Q. And what was done?

**A19. Actually, it was just pricing.** We came down on the [our] price, I believe. I don't remember exactly how much.

Similarly, the free sample evidence was relevant to prove that Richardson discussed TAP's provision of "educational grants or nominal goods or research support" with Lahey Clinic as part of a purchase agreement, contrary to her statement in A2:

Q. And in those conversations with customers, have you ever discussed with a customer giving them educational grants or nominal goods or research support to make up the difference in price between Lupron and Zoladex?

**A2. No, never to make up the difference.**

The free sample evidence tended to prove that Richardson offered things of value to Lahey Clinic in exchange for the clinic's renewal of its contract. The free samples, which were prepared for delivery in close temporal proximity to Richardson's contract negotiations with Lahey Clinic, could reasonably be considered to be an integral -- though unwritten -- part of Lahey Clinic's purchase agreement with TAP, as Weiler's testimony also suggested. Further, the PowerPoint presentation tended to establish that the provision of free drug samples did in fact lower

"the per unit cost" of large customers' Lupron purchases. The free sample evidence was thus relevant to the factual dispute over whether Richardson knew at the time she made statement A19 before the grand jury that "what was done" to satisfy Lahey Clinic's concerns about the high price of Lupron during contract negotiations involved more than "just pricing," but also involved TAP's provision of free Lupron samples not accounted for in the written contract.

Because the evidence was relevant to the charges against Richardson, the district court neither abused its discretion by admitting the documentary evidence, nor committed plain error by admitting the testimonial evidence, concerning the free Lupron samples.

B.     **Admissibility of Evidence Concerning Government Witness's Guilty Plea**

At trial, the government introduced the testimony of a former TAP employee, Kimberlee Chase, who was Richardson's supervisor in 1996 and who left TAP's employment in July 1997. Chase testified about TAP's internal procedures, explaining that Richardson's regular reports to her supervisors, which contained details about Richardson's contract negotiations with Lahey Clinic, were expected to be complete and accurate because they were heavily relied upon by other TAP employees. Chase also testified that employees such as Richardson were eligible for salary bonuses as an incentive to increase their sales performance. In order to remove

the sting of any attempt by Richardson to impeach Chase, the government also introduced testimonial and documentary evidence that Chase had pled guilty to conspiracy to defraud a federal agency and other charges based on conduct during her employment with TAP.

Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403; see also United States v. Rodriguez-Estrada, 877 F.2d 153, 156 (1st Cir. 1989) ("[B]y design, all evidence is meant to be prejudicial; it is only unfair prejudice which must be avoided."). Richardson argues that the jury could have inferred that she was guilty of perjury under "a theory of guilt by association" because Chase, her former supervisor, had pled guilty to a crime. United States v. St. Michael's Credit Union, 880 F.2d 579, 602 (1st Cir. 1989). Moreover, because Chase had pled guilty to conspiracy to commit health care fraud, while Richardson was on trial only for the offenses of perjury and obstruction of justice, Richardson argues that the jury could have been confused about whether Richardson was also on trial for health care fraud.[21]

_____

[21]Richardson asks us to take judicial notice of the fact that Chase's guilty plea was vacated months after Richardson's trial had concluded and after she had filed her notice of appeal. See E.I.

-45-

This risk of prejudice, Richardson maintains, substantially outweighed the weak probative force of Chase's substantive testimony.  Richardson points out that Chase was no longer employed by TAP when Richardson began negotiating Lahey Clinic's contract renewal.  Indeed, Richardson adduced on cross-examination that Chase had no personal knowledge of Richardson's contract negotiations with Lahey Clinic.

Finally, Richardson argues that the government had no need to preemptively impeach its own witness because she offered to forego impeachment of Chase in order to prevent the government from introducing evidence of the guilty plea in its case-in-chief.  The Federal Rules of Evidence permit a party to impeach its own witness.  See Fed. R. Evid. 607 ("The credibility of a witness may be attacked by any party, including the party calling the witness."); United States v. Frappier, 807 F.2d 257, 259 (1st Cir.

du Pont de Nemours & Co., Inc. v. Cullen, 791 F.2d 5, 7 (1st Cir. 1986) (federal court may take judicial notice of complaint filed in related case); but see Eagle-Picher Indus., Inc. v. Liberty Mut. Ins. Co., 682 F.2d 12, 22, n.8 (1st Cir. 1982) (court of appeals "may not ordinarily consider factual material not presented to the court below").  Richardson suggests that the jury may have found her guilty of perjury on a theory of guilt by association with a person whose own guilt has since been called into question.  We need not take notice of the fact that new developments have arisen in Chase's case (much less draw any conclusions regarding Chase's guilt or innocence based on those developments).  This is so because unfair prejudice is measured not retrospectively, but as it existed at the time the contested evidence was introduced at trial, that is, at the time of the "district court's on-the-spot judgment."  Freeman v. Package Machinery Co., 865 F.2d 1331, 1340 (1st Cir. 1988).

1986). This is so even where the defendant agrees to forego impeachment on cross-examination. See United States v. McNeill, 728 F.2d 5, 14 (1st Cir. 1984) (defendant's statement that he would not impeach government's witness "does not diminish the benefit to the jury of having before it information relevant to its task of judging credibility and weighing testimony"). Nevertheless, we have recognized the "possibility of using . . . impeachment of one's own witness improperly if there is no relevant contribution to be made by the witness's principal testimony on direct examination." Frappier, 807 F.2d at 259. Richardson argues that because Chase's testimony was largely irrelevant to the charges against Richardson, her testimony served the sole purpose of permitting the government to introduce, as impeachment evidence, unduly prejudicial evidence it could not otherwise have introduced.

Having reviewed the record in this case with care, we agree with the government that Chase's testimony about TAP's internal procedures made a "relevant contribution" to its case-in-chief, id., and that the government properly sought to introduce evidence of her guilty plea so that the jury could evaluate her credibility. "Only rarely -- and in extraordinarily compelling circumstances -- will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the . . . weighing of probative value and unfair effect." Freeman, 865 F.2d at 1340. In this case, the district court, attentive to

the possibility of undue prejudice, issued a lengthy jury instruction soon after the government elicited Chase's testimony regarding the circumstances of her guilty plea and her possible self-interest in a reduced sentence in exchange for her testimony against Richardson:[22]

> it's up to you whether you believe her, or disbelieve her or believe her in part, she testifies she's got a plea bargain with the government and she's hoping for a lesser sentence having pleaded guilty to whatever she's pleaded guilty to.
> Now you are entitled to know that the better to help you assess her testimony, the believability of her testimony.
> Here's what I want to caution you on. The fact that [Chase has] pleaded guilty to something in no way affects your judgment about Ms. Richardson. In no way. It doesn't at all. Now, you listen to what she says like with all the other witnesses, . . . if you believe that that may have something to do with the case as between the government and Ms. Richardson. But this business that she has . . . pleaded guilty [to] is only before you so that you can evaluate her testimony. That's the only reason.

The court reiterated its instruction when it submitted the case to the jury. "We have held that within wide margins, the potential for prejudice . . . can be satisfactorily dispelled by appropriate curative instructions. Jurors are presumed to follow such instructions, except in extreme cases." United States v. Freeman, 208 F.3d 332, 345-46 (1st Cir. 2000) (internal quotation marks and

_____

[22]Richardson did not and does not challenge the curative jury instruction.

-48-

citations omitted; alteration in original) (discussing spillover prejudice). In light of the immediacy and specificity of the district court's curative instruction, we conclude that the court acted within its discretion by admitting evidence of Chase's guilty plea as impeachment evidence.

As a final matter, Richardson also asserts that the admission of Chase's plea agreement was unduly prejudicial because it contained a reference to TAP's separate "global criminal and civil agreement with the United States, which agreement required the payment of $585,000,000 in civil settlement payments, including restitution," in order to explain why the government recommended "[t]hat the court enter no order of restitution" as part of Chase's individual sentence. Although the offending reference was redacted before Chase's plea agreement was made available to the jury during its deliberations, the government published an unredacted version of the plea agreement to the jury during Chase's testimony at trial. That publication, Richardson argues, raised the risk that the jury would infer that Richardson was guilty of perjury because of her association with an employer that had entered into a "global criminal and civil agreement with the United States."

Richardson did not object to the publication of the unredacted plea agreement, whose unduly prejudicial effect we review for plain error. We discern no such error. Where a plea agreement is introduced, it ordinarily may be introduced in its

entirety. <u>Newton</u>, 891 F.2d at 951 (discussing "long-standing rule that the entire plea agreement of a government witness may be placed before the jury" because "[o]nly by viewing the entire agreement can the jury get the whole picture, from which to assess, as best it can, the probable motives or interests the witnesses could have in testifying truthfully or falsely") (internal quotation marks omitted). The admission of the full plea agreement here did not amount to plain error.

## V. CONCLUSION

Having found that Richardson was tried in compliance with the Speedy Trial Act, that none of the nineteen allegedly false statements charged in Count One advances a theory of conviction for perjury that is contrary to law, and that there was no reversible error in the admission of the challenged evidence, we **affirm** Richardson's conviction.

**Appendices follow.**

**APPENDIX A**

Count One of the superseding indictment charges the following statements as being false:[23]

Q. How about in exchange for a lower price? Rather than giving them a lower price on a contract, have you ever offered a customer or discussed with a customer giving them an educational grant to give them a lower price in reality but not changing the price in the contract?

**A1. No, never outside of a contract.**

. . .

Q. Have you ever had a customer tell you they needed a couple of hundred-thousand dollars more off of the price because Zoladex's price was so much less?

A. Yes. Customers have come before, saying that the competitor is less expensive, so can you lower your price? Yes.

Q. And in those conversations with customers, have you ever discussed with a customer giving them educational grants or nominal goods or research support to make up the difference in price between Lupron and Zoladex?

**A2. No, never to make up the difference.**

. . .

_____

[23]The indictment contains several variations from the transcript of Richardson's grand jury testimony and the audio recording of that testimony. Where such variations might materially affect the meaning of the testimony, we have provided the version contained in the transcript and the audio recording in brackets. Ellipses indicate that sections of the grand jury colloquy are omitted from the indictment. As we have noted, the jury had access to both the transcript and the audio recording of the testimony during its deliberations.

Q.     Did you ever do that with Lahey Clinic? Offer them educational grants to reduce the price on a contract?

**A3.    No I did not.**

Q.     Did you ever discuss that with them?

**A4.**    That customer had brought up some things that they would do, and it would be included in the contract, in order to bring the price closer together, **but we did never do that.**

. . .

Q.     Ma'am, did you ever tell anybody that we need to give this customer an educational grant?

**A5.**    **No.**  That we need to give the customer an educational grant?

Q.     Yes.

**A6.    No.**

. . .

Q.     Ma'am, you just told us earlier today that you knew that it was wrong to give an educational grant to get or keep business, right?

A.     To get business, yes.

Q.     How about to keep business?

A.     To keep business.

Q.     So you knew it was wrong to keep the business, to give an educational grant as well, right?

A.     Right.

Q.     Did you ever do that?

**A7.**    **No, I did not.**

. . .

Q.      I'm right, am I not, Ma'am, that you
        discussed giving educational grants to
        the Lahey Clinic, though, to keep their
        business, right?

**A8.**    **No I did not.**

Q.      You didn't discuss it with anybody at
        the company?

**A9.**    **I did not discuss it with Lahey Clinic
        to keep their business.  No I did not.**

Q.      Did you discuss it with anybody at TAP,
        whether or not to give educational
        grants to Lahey Clinic as part of a way
        to keep their business from switching to
        Zoladex?

**A10.**   **When you put it like that, no I did not.**

Q.      You did not discuss that with anybody at
        the company?

**A11.**   **I did not discuss giving them an
        educational grant instead of pricing in
        order to keep their business.  No I
        never had that discussion.**

. . .

Q.      Did you support their golf tournament?

A.      Yes, that's their charity tournament.

Q.      And were those part of the discussions
        with the folks at Lahey Clinic, that you
        might not be able to reduce the price,
        but you could give them some support
        elsewhere?

**A12.**   **No that is not correct.**

Q.     As a way of effecting a reduction in
       price?

**A13.   No that was separate.**

. . .

Q.     Who at the Lahey Clinic suggested
       nominal goods or educational grants as
       a way of reducing price?

**A14.**   I really can't remember the exact
       conversation and **it was never mentioned
       as a way of reducing price outside of
       [a] contract form.**

. . .

Q.     Okay, ma'am, just so that it's perfectly
       clear, here, your testimony is that it
       was not your idea that educational
       grants and/or nominal goods were posed
       as a way of effecting a lower price,
       that that was Mr. Anderson's idea?

A.     Again I don't remember the specific
       conversation and how that came up.

Q.     I thought you testified earlier that it
       was not your proposal ---

A.     I did not --

Q.     to offer educational grants to reduce
       price?

A.     I didn't -- it was not my proposal.

Q.     And it was not then your proposal?

**A15.   And it was not to decrease the price.**

. . .

Q.     Did you ever tell anybody in the company
       that you could work with the customer or
       [and] TAP could work with the customer,

-54-

a combination of things that included grants, as a way of reducing price?

A.    We talked about that, but it would be something that would be included in a contract.

Q.    What does that mean?

**A16.   That means if we do any of the things that the customer proposed, that it would be within [written into] the contract and would affect the bottom line price.**

.  .  .

Q.    So when the doctors proposed that to you, did you tell them that was illegal, that you couldn't do that?

A.    That it would need to be in a written [written into a] contract.

Q.    Is that what you told them?

A.    I'm sure I did.  I mean, it would need to be put in a contract form.

Q.    Quote, I think the account will be fairly flexible.  We can work with a combination of straight pricing, educational support/grants and/or rebates, closed quote.

**A17.   In a contract form, in a legal, proper way.**

Q.    Did you discuss that with your boss, Brian Duda?

**A18.   I proposed on to him what the account would be willing to work with and we would do it in a legal proper way.**

Q.    And what was done?

-55-

**A19.** **Actually, it was just pricing.** We came down on the [our] price, I believe. I don't remember exactly how much.

**Timeline of Dates and Filings**
**Relevant to Richardson's STA Claim**

| Date | Event | Richardson's Calculation, Days Remaining | Government's Calculation, Days Remaining |
|---|---|---|---|
| 11/17 | Parties appear before Judge Lindsay | 3 | 3 |
| 11/18 | Government files "Motion to Set a Trial Date . . . and for Excludable Delay" | 2 | 3 |
| 11/20 | Richardson files response | 0 | 3 |
| 11/24 | Government files reply | 0 | 3 |
| 11/25 | Richardson files "Memorandum of Opposition" seeking dismissal of indictment on STA grounds | 0 | 3 |
| 12/1 | Case is reassigned by Judge Lindsay, parties reappear before Judge Young and agree to exclusion of period from 12/8 until 1/12 in the interest of justice | 0 | 3 |
| 12/3 | Government files motion in limine | 0 | 2 |
| 12/5 | Richardson files renewed motion to dismiss for legal defects in indictment | 0 | 2 |
| 12/16 | Richardson files motion to dismiss indictment on STA grounds | 0 | 2 |

| | | | |
|---|---|---|---|
| 12/23 | Richardson responds to government's motion in limine | 0 | 2 |
| 12/29 | Richardson files motion in limine | 0 | 2 |
| 1/12 | Richardson's trial begins, Richardson's motion to dismiss on STA grounds is denied, Richardson's motion in limine is denied | 0 | 2 |