# United States Court of Appeals
## For the First Circuit

No. 12-1949

UNITED STATES OF AMERICA,

Appellee,

v.

RICHARD SOUZA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Howard, Ripple,* and Thompson,
Circuit Judges.

Rebecca A. Jacobstein, with whom Office of Appellate Advocacy
was on brief, for appellant.
Randall E. Kromm, Assistant United States Attorney, with whom
Carmen M. Ortiz, United States Attorney was on brief, for appellee.

April 18, 2014

_____

* Of the Seventh Circuit, sitting by designation.

**HOWARD, <u>Circuit Judge</u>**.  Richard Souza appeals from his conviction and sentence for structuring financial transactions to evade reporting requirements.  We affirm.

## I.  Background

In 2004, Souza was hired to repair the roof of Lawrence Burtchaell, an elderly widower.  The two developed a close relationship and soon Souza was spending several days a week at Burtchaell's home.

During this time period, Burtchaell's acquaintances began noticing symptoms of mental decline.  Usually well dressed, Burtchaell began looking disheveled.  He also had difficulty remembering neighbors' names, he would get lost walking around the neighborhood, and one time he flooded his house because he forgot to turn off the bath.  Burtchaell's diminishing mental capacity was also detected by his investment advisor, Mark Friese, who registered concern with his manager.

In 2006, Souza persuaded Burtchaell to put up money to purchase real estate in Maine.  Souza told Burtchaell and Friese that Burtchaell was a partner in the investment, but revealed neither that the other partners were Souza's sons, nor that Burtchaell was providing all of the purchase money.  Though Souza promised that in a few weeks Burtchaell would recoup his money with interest, Burtchaell never saw any return on the investment.

After closing the deal, Burtchaell took out an $89,000 loan on the property and wired almost all of the proceeds to Souza's account with Sovereign Bank. In the following months, Souza withdrew all of these funds, always in increments of less than $10,000. For instance, on June 15, 2006, within a period of an hour and a half, Souza withdrew $54,000 in six separate installments of $9000 at five different Sovereign branches.

Banks are required to file a report when an individual withdraws $10,000 or more. 31 U.S.C. § 5313(a); 31 C.F.R. § 1010.311. For purposes of reporting, banks aggregate an individual's daily transactions across all branches. 31 C.F.R. § 1010.313(b). Thus, Sovereign treated Souza's six June 15 withdrawals as one $54,000 withdrawal and filed a report.

Souza was charged with structuring his June 15 transactions for the purpose of evading the reporting requirements, in violation of 31 U.S.C. § 5324(a)(3). Souza claimed that he had been forced to make multiple withdrawals of $9000 because each Sovereign branch ran out of money. To rebut this claim and to show Souza's intent to evade the reporting requirements, the government presented evidence of the Maine transaction, arguing that Souza wished to avoid drawing attention to his withdrawals because they were composed of ill-gotten funds. Souza was convicted and sentenced. He appeals.

## II. Discussion

Souza claims violations of his rights to a speedy trial, to effective assistance of counsel, and to due process. He also argues that the district court made erroneous evidentiary rulings and sentencing errors. None of these arguments is persuasive.

### A. Speedy Trial

Souza contends that he was denied his speedy trial right. That right derives from two sources: the Speedy Trial Act (STA), 18 U.S.C. §§ 3161-74, and the Sixth Amendment.

#### 1. STA

The STA places time limits on two periods in criminal proceedings: the period between arrest and indictment, and the period between indictment and trial. Id. § 3161(b)-(c). In computing the amount of time that has elapsed during these periods, the STA permits courts to exclude certain intervals. Id. § 3161(h).

Souza alleges STA violations in both periods. We review STA challenges de novo as to legal rulings and for clear error as to factual findings. United States v. Valdivia, 680 F.3d 33, 38 (1st Cir.), cert. denied, 133 S. Ct. 565 (2012). Overall, however, we review for abuse of discretion decisions to exclude intervals of time from the STA count. United States v. Gates, 709 F.3d 58, 64 (1st Cir.), cert. denied, 134 S. Ct. 264 (2013).

### a. Between Arrest and Indictment

The STA calls for indictment no later than thirty days after arrest. 18 U.S.C. § 3161(b). Souza was arrested on August 12, 2010 and was indicted on September 30. He argues that only fourteen of these forty-nine days are excludable, leaving thirty-five days -- five more than the STA permits. Although "delay resulting from any pretrial motion" is excludable, id. § 3161(h)(1)(D), including up to thirty days "during which any proceeding concerning the defendant is actually under advisement by the court," id. § 3161(h)(1)(H), Souza claims that no excludable time resulted from a joint motion filed by the parties on August 20. He makes three points, none of which is availing.

First, Souza argues that the joint motion, which sought "enlargement of time" to obtain an indictment, requested relief that the court was incapable of granting. Souza did not make this argument to the district court. Even if he had, while it is true that courts cannot "enlarge" the time limits established by the STA, courts can "exclude" certain periods in the interest of justice, see id. § 3161(h)(7)(A), and the joint motion, was functionally equivalent to an anticipatory motion to exclude time. Souza does not and could not contend that the purely semantic difference prejudiced the proceedings in any way.

Second, Souza contends that the exclusion of time sought by the joint motion was not in the interest of justice. But it is

irrelevant whether the motion's reasons for seeking exclusion had merit:  time was excludable not because the court granted the joint motion, but because the court had the motion under advisement.

Third, Souza asserts that the toll that stops the clock while a court considers a pretrial motion should not apply when the motion seeks a continuance.  Otherwise, says Souza, a party intent on excluding time could obtain that result simply by filing a motion.  But in United States v. Richardson, we rejected this argument and held that a motion to continue can toll the speedy trial clock.  421 F.3d 17, 31 (1st Cir. 2005).

Of course, as we cautioned in Richardson, "neither counsel nor district courts may employ measures for excluding time from the speedy trial clock that impermissibly frustrate the STA's purpose of protecting the shared interest of criminal defendants and the public in 'bringing criminal charges to the bar of justice as promptly as practicable.'"  Id. at 29 (quoting United States v. Hastings, 847 F.2d 920, 923 (1st Cir. 1988)).  As was true of the motion to continue in Richardson, the joint motion here "was not filed as a pretext to avoid the consequences of an STA violation, but was filed for the legitimate purpose of seeking a continuance in the interest of justice."  Id.  Counsel for both Souza and the government sought the continuance to carry on preexisting plea negotiations and because each had a long-standing vacation planned.  Since we have expressly left open the issue whether periods of plea

-6-

negotiation can properly be excluded, <u>United States</u> v. <u>Scantleberry-Frank</u>, 158 F.3d 612, 615 (1st Cir. 1998), a motion to continue made on that basis, while not guaranteed to succeed, will not be deemed pretextual on that ground alone.  Similarly, because we have held that "[a] reasonable vacation constitutes a plausible basis for excluding a relatively brief period of time," <u>Gates</u>, 709 F.3d at 67, a motion to continue made on that basis is also not necessarily pretextual.

Nor does the fact that Souza objected to the joint motion render it pretextual.  After all, "defense counsel has the power to seek an STA continuance without first informing his client or obtaining his client's personal consent."  <u>Id.</u> at 66.  Souza's objection is merely "a datum for the district court to consider in its analysis of the ends of justice," and must be measured in light of both attorneys' legitimate reasons for requesting a continuance. <u>Id.</u>

Because the STA permits a court to exclude up to thirty days while a motion is under advisement, 18 U.S.C. § 3161(h)(1)(D), (H), the joint motion tolled the speedy trial clock beginning on August 20 and continuing through September 19.  This exclusion reduces the counted number of days between the August 12 arrest and the September 30 indictment below thirty, and therefore within the limits of the STA.

###### b. Between Indictment and Trial

The STA calls for trial no later than seventy days after indictment. 18 U.S.C. § 3161(c)(1). Souza was indicted on September 30, 2010 and his trial began on February 27, 2012. He argues that only 201 of these 515 days were excludable, leaving 314 days -- 244 more than the STA permits.

"[E]xclusions of time not <u>specifically challenged</u> in a motion to dismiss are deemed waived." <u>Gates</u>, 709 F.3d at 68 (emphasis added). Souza did not file a motion to dismiss challenging specific intervals in the pretrial period. Instead, through pro se filings, he protested generally about delay. On appeal, he avers that these general protestations were meant to convey that there were no excludable intervals anywhere in the pretrial period. This mischaracterizes his filings, which comprised vague complaints of delay and accusations against the court, the government, and his attorneys for colluding to impair his speedy trial right. Even when viewed as charitably to Souza as possible, his assertions did not in any event challenge exclusions of time during the pretrial period, thus waiving such challenges on appeal.[1]

---

[1] Because we conclude that Souza's pro se filings failed to preserve challenges to specific exclusions of time, we need not address whether the district court authorized the type of "hybrid representation" that would permit Souza to make a pro se filing while represented by counsel.

## 2. Sixth Amendment

Souza also contends that the delay between his arrest and trial violated the Sixth Amendment's guarantee of a speedy trial. We review the district court's Sixth Amendment decision for abuse of discretion. United States v. Santiago-Becerril, 130 F.3d 11, 21 (1st Cir. 1997). To determine whether a Sixth Amendment violation has occurred, a court balances four factors: "(1) the length of the delay, (2) the reasons for the delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant resulting from the delay." United States v. Dowdell, 595 F.3d 50, 60 (1st Cir. 2010) (citing Barker v. Wingo, 407 U.S. 514, 530 (1972)).

### a. Length of Delay

Length of delay, in addition to factoring into the balance, serves as a triggering mechanism for review, since a court will conduct a Sixth Amendment analysis only after a defendant has shown that the period of time "has crossed the threshold dividing ordinary from presumptively prejudicial delay." Doggett v. United States, 505 U.S. 647, 651-52 (1992) (internal quotation marks omitted). Generally, delay becomes prejudicial around the one-year mark. See id. at 652 n.1; Dowdell, 595 F.3d at 61.

Here, roughly eighteen months passed between Souza's arrest in October 2010 and his trial in February 2012. For purposes of analysis, we will assume, without deciding, that the eighteen-month delay establishes a presumption of prejudice,

triggering further Sixth Amendment review.  See, e.g., Santiago-Becerril, 130 F.3d at 21 (assuming that fifteen-month delay was presumptively prejudicial).

As for its place in the balancing test, a lengthier delay raises the likelihood that the defendant suffered prejudice. Doggett, 505 U.S. at 652.  While the delay in Souza's case was not at the extreme end of the spectrum, see Barker, 407 U.S. at 534 ("It is clear that the length of delay between arrest and trial -- well over five years -- was extraordinary."); but see United States v. Munoz-Franco, 487 F.3d 25, 61 (1st Cir. 2007) ("The five years that elapsed between indictment and trial is a troublesome length of time.  Nonetheless, our inquiry has revealed no constitutional violation."), we have held that a fifteen-month delay is "[a]rguably . . . long enough to tip the scales slightly in favor of [the defendant's speedy trial] claim," Santiago-Becerril, 130 F.3d at 22.  We will assume for the sake of argument that the eighteen-month delay in Souza's case weighs in his favor, but, as we explain below, not heavily enough to overcome the countervailing weights of the second and fourth factors.

### b. Reasons for Delay

Of the four factors in the analysis, examination of the reasons for delay is the "focal inquiry."  Munoz-Franco, 487 F.3d at 60 (internal quotation marks omitted).  We must first determine if the delays were attributable to Souza or to the government.

-10-

"[D]elays sought by [defense] counsel are ordinarily attributable to the defendants they represent."  Vermont v. Brillon, 556 U.S. 81, 85 (2009).  For those delays caused by the government, we must evaluate the underlying reasons:

> A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government.  A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.  Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

Barker, 407 U.S. at 531 (footnote omitted).

This factor weighs against Souza.  Much of the delay resulted from his actions or those of his counsel.  Between his arrest and the appointment of his ultimate trial counsel, Souza twice violated the terms of his release, necessitating further proceedings, and thrice obtained new counsel, who sought continuances on several occasions.  Additionally, Souza filed two pretrial motions, which further delayed the proceedings.

The delays attributable to the government were not motivated by a deliberate attempt to defer the trial.  Some were traceable to the fact that replacement counsel for the government needed time to gain familiarity with the case after the initial counsel left the U.S. Attorney's Office.  Others resulted from the medical leave of an IRS agent who was needed to produce certain

documents. These fall into the category of valid reasons that justify an appropriate delay. Further appropriate delay occurred when the case was transferred to a new district court judge after the initial judge retired.

Once the trial date was set, it was continued twice. First, the government moved for a continuance because counsel had another trial and an appellate argument scheduled during the same month as Souza's trial. Thereafter, Souza's counsel moved to continue because he had a conflict with the new trial date. All in all, the government, as compared to Souza and his counsel, played a minimal role in delaying the trial.

### c. Defendant's Assertion of the Right

From the outset, Souza made it clear that he wished to proceed to trial as quickly as possible. This factor weighs in his favor, but not enough to overcome the weight that the second and fourth factors carry against him.

### d. Prejudice Resulting from the Delay

Prejudice is assessed in light of the interests that the speedy trial right was designed to protect: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." Barker, 407 U.S. at 532.

The last of these interests is the most serious, as it implicates "the fairness of the entire system," and we begin with

-12-

it here.  Id.  Souza argues that evidence and testimony of witnesses was lost or hampered as a result of the delay between his criminal conduct, which occurred in 2006, and his trial, which occurred in 2012.  But most of this period is irrelevant for speedy trial purposes.  The speedy trial right "attaches upon arrest or indictment, whichever occurs first," Santiago-Becerril, 130 F.3d at 21, and Souza was not arrested until August 12, 2010.  The delay in obtaining the arrest following his criminal conduct implicates separate rights, see Munoz-Franco, 487 F.3d at 58, not invoked by Souza on appeal.  Though Souza speculates about prejudice, he points to nothing in the eighteen-month period between his arrest and trial that impaired his ability to mount a defense.

As to pretrial incarceration, we cannot say that the delay between Souza's arrest and trial caused him prejudice.  Souza was incarcerated while awaiting trial only because he failed to abide by the conditions of his release.  And, as to anxiety and concern, since "considerable anxiety normally attends the initiation and pendency of criminal charges[,] . . . only undue pressures are considered."  United States v. Henson, 945 F.2d 430, 438 (1st Cir. 1991) (internal quotation marks omitted).  The record does not suggest that Souza was subject to such undue pressures.

Weighing all four factors, in light of the facts that Souza and his counsel were largely responsible for the delay and that Souza did not experience prejudice as a result, we discern no

abuse of discretion in the district court's determination that Souza's Sixth Amendment right was respected.

## B. Ineffective Assistance of Counsel

Souza argues that his counsel provided ineffective assistance by filing the joint motion for enlargement of time. Souza claims that his attorney agreed to this motion without consulting Souza and that the motion ran counter to his interests.

This is neither the time nor the place to first raise the ineffective assistance claim. Such claims "should ordinarily be litigated in the first instance in district court. It is true that we make an exception for cases in which trial counsel's ineffectiveness is manifestly apparent from the record, but this is not such a case." United States v. Wyatt, 561 F.3d 49, 52 (1st Cir. 2009) (citations omitted). Souza's ineffective assistance of counsel claim requires further factual development, so he must wait to raise it on collateral review.

## C. Due Process

Souza claims that his conviction under 31 U.S.C. § 5324(a)(3) violates due process because the statute fails to provide fair notice that his conduct was criminal. Because his actions -- withdrawing $54,000 in $9000 increments from multiple branches in one day -- in fact triggered the bank's reporting requirements, he wonders how he can be punished for evading those

-14-

requirements.  We review such a challenge de novo.  United States v. Hussein, 351 F.3d 9, 14 (1st Cir. 2003).

Souza's argument misses the point.  Section 5324(a)(3) makes it a crime to structure transactions "for the purpose of evading the reporting requirements."  31 U.S.C. § 5324(a)(3) (emphasis added).  The statute focuses on an individual's intent to evade the reporting requirements, not on whether he succeeds in doing so.  United States v. Sweeney, 611 F.3d 459, 471 (8th Cir. 2010) ("[Section] 5324 prohibits persons from conducting transactions with the intent to evade the reporting requirement, regardless of whether a plan to evade the reporting requirement succeeds (by staying below the $10,000 threshold) or fails (by exceeding the $10,000 threshold)."); United States v. Van Allen, 524 F.3d 814, 825 (7th Cir. 2008) ("Whether or not Van Allen actually fooled Archer Bank has no bearing on the substantive violation under 31 U.S.C. § 5324(a).").  Consistent with due process, Souza could be convicted of structuring his transactions in a way that demonstrates his intent to evade the reporting requirements, even though he failed to actually evade them.

## D.  Evidentiary Rulings

According to Souza, the district court erred in admitting evidence related to the source of the funds that were eventually structured.  This included evidence of Burtchaell's purchase of the Maine property, the loan he took out on that property, and his

-15-

transfer of the loan proceeds to Souza's account. We review such evidentiary rulings for abuse of discretion. <u>United States</u> v. <u>Green</u>, 698 F.3d 48, 55 (1st Cir. 2012).

Souza first claims that evidence of fraudulent activity related to the Maine transaction was not intrinsic to the charged crime of structuring and, as extrinsic evidence, comprised prior acts that were inadmissible under Federal Rule of Evidence 404(b). Intrinsic evidence includes prior acts that are "part of [the] necessary description of the events leading up to the crime[]" or that go to "an element of the charged offense." <u>United States</u> v. <u>Fazal-Ur-Raheman-Fazal</u>, 355 F.3d 40, 50 (1st Cir. 2004). Here, evidence of the funds' source was part of the necessary description of the events leading up to the structuring; that evidence, as it suggested Souza knew he had obtained the funds in an illicit manner, also went to the element of his intent to evade the reporting requirements. The district court did not abuse its discretion in treating this evidence as intrinsic to the crime charged.[2]

Souza also argues that the evidence should have been excluded under Rule 403 as unfairly prejudicial. We reverse the

---

[2] Because we conclude that the evidence was intrinsic to the charged crime and went to the issue of Souza's intent, we need not address his argument that the evidence was inadmissible under Rule 404(b). <u>See</u> <u>United States</u> v. <u>Mare</u>, 668 F.3d 35, 39 (1st Cir. 2012) (citing <u>Fazal-Ur-Raheman-Fazal</u> for the proposition that "intrinsic evidence that would satisfy the charged crime's specific intent element is not governed by Rule 404(b)").

district court's judgment about the prejudicial effect of evidence "[o]nly rarely -- and in extraordinarily compelling circumstances." Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988). Souza avers that evidence of the funds' source lacked probative value because the government could have proven its case exclusively through the structure of the transactions. Of course, at trial the government needed to overcome Souza's assertion that he was forced to complete his withdrawals as he did because none of the bank branches had enough cash on hand. And while theoretically a jury could have inferred Souza's intent to evade the reporting requirements simply from the structure of the transactions themselves, evidence of how Souza obtained the funds provided important additional information with which to evaluate his intent. See United States v. Davenport, 929 F.2d 1169, 1174 (7th Cir. 1991) ("The Davenports say it is irrelevant to their guilt of the crime of which they were charged where they got the money. It is not irrelevant. The shadier the source, the greater the Davenports' motive to conceal the money from the authorities by taking measures to thwart the reporting requirements."); see also Old Chief v. United States, 519 U.S. 172, 188 (1997) ("[T]he prosecution may fairly seek to place its evidence before the jurors, as much to tell a story of guiltiness as to support an inference of guilt . . . .").

We understand Souza's concern about the prejudicial effect this evidence might have had on the jury. The prosecution devoted considerable time to the Maine transaction. And Souza, in turn, reasonably felt compelled to respond to allegations of fraud in that transaction. Evidence that Souza defrauded an elderly, vulnerable man ran the risk of prejudicing the jury. See United States v. Gilbert, 229 F.3d 15, 24 (1st Cir. 2000) (noting the prejudice that can attend a "mini-trial" on uncharged conduct). But Rule 403 excludes evidence only when its prejudicial effect substantially outweighs its probative value, and we cannot say that the district court abused its discretion in refusing to find such substantial outweighing here. Moreover, the district court instructed the jury to focus on the charged conduct, as opposed to any potential uncharged crime. See United States v. Williams, 717 F.3d 35, 41-42 (1st Cir. 2013) (noting that limiting instruction can help prevent unfair prejudice in these situations).

**E. Sentencing**

Souza argues that the district court's sentencing guidelines calculation was erroneous in three respects. We review the sentencing court's factfinding for clear error and its construction and application of the guidelines de novo. United States v. Ihenacho, 716 F.3d 266, 276 (1st Cir. 2013).

## 1. Amount of Structured Funds

The district court found that the structured funds consisted of a June 8, 2006 withdrawal of $5000, a June 12 withdrawal of $5500, a June 13 withdrawal of $4976.26, a June 14 withdrawal of $3700, and the six June 15 withdrawals of $9000 each, all totaling $73,176.26. Because the structured funds totaled more than $70,000, the court applied an eight-level increase to Souza's offense level under U.S.S.G. § 2B1.1(b)(1)(E).

Souza argues that the structured funds consisted of only the $54,000 withdrawn in six installments on June 15. Therefore, says Souza, the court should have applied only the six-level increase that corresponds to structured funds totaling between $30,000 and $70,000. See id. § 2B1.1(b)(1)(D). Souza points out that, while a $9000 withdrawal is just under the $10,000 reporting threshold, none of his other withdrawals came close to the limit. He also argues that the June 13 withdrawal of $4976.26 is too specific to show structuring, and likely was used to pay a bill.

We see no clear error in the district court's calculation of the structured funds. There is no requirement that structuring involve whole numbers or amounts just under $10,000. Although the withdrawals between June 8 and June 14 were not identical to those of June 15, they share enough similarities that the court could have reasonably concluded that all of the withdrawals were meant to evade the reporting requirements. They all occurred within a short

-19-

time period: no more than one business day elapsed between any of the withdrawals. They all involved several thousands of dollars. And they all closely followed the deposit of the bulk of Burtchaell's loan proceeds into Souza's account.

## 2.  Proceeds of Unlawful Activity

The district court found that Souza knew the structured funds were the proceeds of unlawful activity, and thus applied a two-level increase under U.S.S.G. § 2S1.3(b)(1)(A).

Souza argues that there was no evidence that he acquired the funds through unlawful activity. According to Souza, Burtchaell's consent to the Maine transaction was obtained neither through fraud nor through misrepresentation.

The record tells a different story. Souza misrepresented the nature of the Maine transaction by failing to disclose to Burtchaell and Friese that the other partners were Souza's sons or that Burtchaell was providing all of the purchase money. Souza also promised illusory returns on the investment, and then convinced Burtchaell to take out a loan on the property and to transfer the bulk of the loan proceeds to Souza's account. All of this provides enough evidence to support the district court's finding that Souza knew the structured funds derived from unlawful activity.

### 3. Vulnerable Victim

The district court found that Souza knew or should have known that Burtchaell was a vulnerable victim, and thus applied a two-level increase under U.S.S.G. § 3A1.1(b)(1). The guidelines define a vulnerable victim as "a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." Id. § 3A1.1 cmt. n.2.

Souza challenges the vulnerable victim increase on two grounds. First, he says that even if he defrauded Burtchaell, Burtchaell was not a victim of the charged crime of structuring. Second, Souza says he did not know of and had no reason to know of Burtchaell's vulnerability.

### a. "Victim"

To come within the guidelines' definition, one need not be a victim of the charged offense so long as one is a victim of the defendant's other relevant conduct. Id. Relevant conduct includes all acts that occurred during the preparation and commission of the offense. See id. § 1B1.3(a)(1). And for an offense like structuring, relevant conduct also includes acts that were "part of the same course of conduct or common scheme or plan." See id. §§ 1B1.3(a)(2), 3D1.2(d). A common scheme or plan involves

acts connected "by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi."  Id. § 1B1.3 cmt. n.9(A).

Souza argues that any fraud of which Burtchaell might have been a victim was not relevant conduct with respect to the charged offense of structuring.  We disagree.  The fraud and the structuring were part of a common scheme: without the fraud, Souza would not have acquired the funds that he went on to withdraw through structured transactions, and the structuring was meant to extract without detection his ill-gotten gains.  This case is similar to United States v. Johnson, in which fraud perpetrated against telemarketing victims was deemed relevant to the charged offense of money laundering, because the fraud "provided the illicit funds necessary to finance additional criminal activity." 297 F.3d 845, 873 (9th Cir. 2002); see also United States v. Firment, 296 F.3d 118, 120-21 (2d Cir. 2002) ("[W]e see no error in the district court's application of the vulnerable victim enhancement to Firment on the basis of the vulnerability of the victims of the telemarketing scheme that generated the taxable revenues, despite the fact that his offense of conviction was a tax offense.").  In short, the district court did not err in determining that Burtchaell was a victim of conduct that was relevant to the charged structuring.

### b. "Vulnerable"

The evidence of Burtchaell's diminished capacity was considerable, consisting of testimony from his neighbors that he began to look disheveled, that he had difficulty remembering their names, that he would get lost walking around the neighborhood, and that he once flooded his house by leaving the bath running, as well as testimony that his financial advisor had reported to his manager concern about Burtchaell's slipping mental faculties. Coupled with evidence that Souza spent substantial time with Burtchaell during this period, we see no clear error in the district court's determination that Souza knew or had reason to know of Burtchaell's vulnerability.

### III. Conclusion

For the foregoing reasons, Souza's conviction and sentence are **<u>affirmed</u>**.