# United States Court of Appeals
## For the First Circuit

No. 15-2405

UNITED STATES OF AMERICA,

Appellee,

v.

MICHAEL DAVID SCOTT,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Howard, Chief Judge,
Thompson and Kayatta, Circuit Judges.

George F. Gormley, with whom Stephen Super and George F. Gormley, P.C. were on brief, for appellant.
David B. Goodhand, Attorney, U.S. Department of Justice, Criminal Division, Appellate Section, with whom William D. Weinreb, Acting U.S. Attorney, Victor A. Wild, Assistant U.S. Attorney, Ryan M. DiSantis, Assistant U.S. Attorney, Kenneth A. Blanco, Acting Assistant Attorney General, U.S. Department of Justice, and Trevor N. McFadden, Deputy Assistant Attorney General, were on brief, for appellee.

December 8, 2017

**KAYATTA**, **Circuit Judge**.  Michael David Scott appeals from his conviction and sentence for wire fraud, bank fraud, and money laundering, associated with a mortgage fraud scheme perpetrated in the Boston area.  His principal argument is that the government unfairly procured his guilty plea by misusing information he provided during proffer sessions.  He also challenges his sentence.  For the following reasons, we affirm.

## I.  Background

In February 2008, the government began investigating Scott as a result of a civil case against him in Massachusetts state court involving a mortgage fraud scheme Scott operated in and around Boston.  Scott purchased multi-family homes, divided them into condominium units, and then recruited straw buyers to purchase the units at prices favorable to Scott.  He attracted buyers by promising that they would not have to put up any money for the purchase and would ultimately be able to sell for a profit.  Scott and his team also prepared false mortgage applications and closing documents in order to secure inflated loans for the buyers.  Scott then used the loan proceeds to pay off his own mortgage on the building, and pocketed the profit.

In February 2009, the government informed Scott of the federal investigation against him.  On February 23, 2009, Scott and his attorney met with two Assistant United States Attorneys, as well as three FBI Special Agents.  At that meeting, Scott signed

a proffer agreement with the government. The agreement provided, among other things:

> 1. No statements made or other information provided by Michael Scott will be used by the United States Attorney directly against him, except for purposes of cross-examination and/or impeachment should he offer in any proceeding statements or information different from statements made or information provided by him during the proffer, or in a prosecution of Michael Scott based on false statements made or false information provided by Michael Scott.
> 2. The government may make derivative use of, or may pursue any investigative leads suggested by, any statements made or other information provided by Michael Scott in the course of the proffer. Any evidence directly or indirectly derived from the proffer may be used against him and others in any criminal case or other proceeding. This provision is necessary in order to eliminate the possibility of a hearing at which the government would have to prove that the evidence it would introduce is not tainted by any statements made or other information provided during the proffer. See Kastigar v. United States, 406 U.S. 441 (1972).

After he signed the proffer agreement, Scott gave the government information regarding the fraudulent condominium sales he had conducted, including information about the fake paperwork he provided to secure loans. Scott also provided information regarding the roles played by James Driscoll, a sales loan officer employed by both a mortgage company and a bank, and Michael Anderson, a real estate lawyer, in the mortgage fraud scheme. Over the course of three proffer sessions held in March 2009, Scott

provided the government with detailed information regarding Driscoll -- that he often worked from home and that he kept copies of the mortgage paperwork from his employers at home -- as well as information regarding the physical layout of Driscoll's home. Using this information, the government applied for a search warrant of Driscoll's home, which was approved on March 16, 2009.

On May 15, 2009, the government got Scott to sign two consent-to-search forms authorizing the government to make forensic images of his computer and server. The forms allowed the FBI to conduct "a complete search" of Scott's Compaq computer and Dell server. The forms stated, among other things, that Scott gave "permission for this search, freely and voluntarily, and not as the result of threats or promises of any kind" and "authorize[d] [FBI] Agents to take any evidence discovered during this search, together with the medium in/on which it is stored, and any associated data, hardware, software and computer peripherals." Scott's attorney was not present at this meeting, although he had authorized it. Scott continued to meet with the government for proffer sessions, for a grand total of eighteen sessions, ending in June 2010. Starting in the fall of 2009, Scott and the government also engaged in plea negotiations that ultimately fell apart.

In January 2010, while proffer sessions and plea negotiations were ongoing, Scott began meeting with members of the

accounting firm Verdolino & Lowey ("V&L"). Back in April 2009, Scott had filed for bankruptcy and a United States Trustee was appointed to oversee the proceeding. V&L served as the accountant for the bankruptcy trustee. Once Scott began meeting with V&L, he provided the firm with his business records in paper form, as well as access to images of the content of his computer server and laptop.

About a month after the final proffer session with Scott, the government withdrew an unaccepted plea agreement it had proposed. Shortly thereafter, the government convened a grand jury, calling one of the FBI agents involved in Scott's case as its sole witness. The grand jury indicted Scott on 62 counts on August 26, 2010. On September 16, the government obtained a 68-count superseding indictment against Scott. The superseding indictment also charged Jerrold Fowler, the founder of an investment company, and Thursa Raetz, a credit union representative, for their participation in the mortgage fraud scheme.

Seventeen months later, the bankruptcy trustee told prosecutors that he would likely dismiss Scott's bankruptcy petition. The prosecutors asked the trustee to preserve the materials Scott had provided to V&L, but the trustee did not turn over the materials, citing conflicting legal duties. The trustee dismissed Scott's petition on March 14, 2012, and the government

soon after applied for a search warrant to seize the computer images and paper files Scott had provided to V&L. The affidavit submitted in support of the search warrant relied in large part on data obtained from Scott's server, which had been imaged in May 2009 pursuant to Scott's written consent. The application explicitly sought to search "the same server" as well as the boxes of materials that Scott had provided to V&L. The magistrate judge assigned to Scott's case approved the warrant application on March 21, 2012, and the government executed the warrant. In a discovery letter sent in June 2012, the government informed Scott that the hard drives it had imaged from V&L were the same as the images the government had taken directly from Scott in 2009.

On February 6, 2013, the magistrate judge held a status conference, during which the government represented that, with one exception not relevant here, "every piece of information presented to the Grand Jury came from an independent source."[1] The implication of this statement in context was that the evidence presented to the grand jury was derivative of (but did not directly

---

[1] The portion of the conference transcript Scott quotes in his briefing actually reflects Scott's own attorney's characterization of the government's position "that every piece of information presented to the Grand Jury came from an independent source." This does not impact our analysis, however, because the government immediately thereafter responded, "That's correct." We therefore treat the representation as if it had come directly from the government.

make use of) evidence obtained from Scott himself, and therefore conformed to the proffer agreement.

When Scott learned that the government intended to use evidence from the March 2012 search of V&L in its case against him, he moved to suppress the evidence. Scott argued that using that evidence "was a blatant end-run around the proffer agreement" and that V&L, acting under the government's instruction, violated the Fourth Amendment when it retained custody of Scott's property after his bankruptcy petition was dismissed. The government countered that the terms of the consent Scott provided in May 2009 placed his searched property outside the scope of the proffer agreement, thereby rendering it unprotected. The government further argued that even if that were not the case, the use of data obtained in the March 2012 search was permissible derivative use. The court rejected the government's arguments and granted Scott's motion to suppress "the cloned files" seized pursuant to both Scott's consent forms and the search of V&L.

Over a year later, on May 29, 2015, the district court accepted Scott's unconditional plea of guilty to the superseding indictment. At sentencing, the court determined the applicable guideline sentencing range to be 135 to 168 months. See U.S. Sentencing Guidelines Manual ("U.S.S.G.") ch. 5, pt. A (U.S. Sentencing Comm'n 2015). The court arrived at this range after a downward departure for Scott's acceptance of responsibility and

another reduction of "two levels to give Mr. Scott the benefit of the doubt as to the loss calculation." The court ultimately sentenced Scott to 135 months' imprisonment on counts 1 through 46 and 120 months' imprisonment on counts 47 through 68, to be served concurrently.[2] Fowler and Raetz were each sentenced to 24 months' imprisonment, after most of the counts against them were dismissed. The court also ordered Scott to pay over $11 million in restitution. Scott timely appealed his conviction and sentence.

## II. Discussion

Scott challenges his conviction on the grounds that the government breached the proffer agreement, both by presenting evidence to the grand jury that was obtained directly from him and by continuing to prosecute him even after the court granted his motion to suppress. Scott also challenges his sentence to 135 months of imprisonment, on the grounds that it was procedurally improper and substantively unreasonable. We address each argument in turn.

### A.

As his principal basis for appeal, Scott asks that we vacate his conviction and sentence and remand for a Kastigar hearing, see Kastigar v. United States, 406 U.S. 441, 448–60 (1972), to determine what, if any, evidence obtained during his

---

[2] Scott challenges only his 135-month sentence. We therefore omit any further discussion of his concurrent 120-month sentence.

proffer sessions was used by the government to secure his indictment and prepare for trial.

Scott's request faces an immediate problem: his unconditional guilty plea. Once a criminal defendant enters such a plea, "he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." Tollett v. Henderson, 411 U.S. 258, 267 (1973).[3] In this circuit, "[w]e have assiduously followed the letter and spirit of Tollett, holding with monotonous regularity that an unconditional guilty plea effectuates a waiver of any and all independent non-jurisdictional lapses that may have marred the case's progress up to that point." United States v. Cordero, 42 F.3d 697, 699 (1st Cir. 1994) (collecting cases).[4]

---

[3] At least two exceptions to the Tollett rule have been recognized but are not applicable here. See Menna v. New York, 423 U.S. 61, 62 (1975) (per curiam) (holding that Tollett does not prevent a defendant from challenging a conviction based on the double jeopardy clause); Blackledge v. Perry, 417 U.S. 21, 30 (1974) (holding that Tollett does not prevent a defendant from using a federal writ of habeas corpus to challenge the "very power of the State to bring the defendant into court" where the state's vindictive prosecution denied him due process of law).

[4] The Supreme Court has declined to frame the Tollett line of cases as establishing a waiver rule. See Menna, 423 U.S. at 62 n.2 (clarifying that the Tollett rule is not that counseled guilty pleas waive antecedent constitutional violations, but rather that such a reliable admission of factual guilt "simply renders irrelevant those constitutional violations"); see also Tollett, 411 U.S. at 267 (finding that the defendant's guilty plea "forecloses independent inquiry" into a claim of error regarding the grand jury notwithstanding the absence of "waiver" in the traditional sense of the word). Because this distinction has no

- 9 -

Tollett does not, however, prevent a defendant from arguing that his guilty plea was involuntary.  Tollett, 411 U.S. at 267; see also United States v. Castro-Vazquez, 802 F.3d 28, 33 (1st Cir. 2015) ("So long as the unconditional guilty plea is knowing and voluntary, the Tollett rule applies.").

To work around Tollett, Scott argues that his guilty plea was not voluntary because it was based on a government-induced misapprehension that the government had proof for its case that it was permitted to use under the terms of the proffer agreement. Before turning to this argument, we consider the appellate standard of review.

Scott never asked the district court to do what he asks us to do:  let him withdraw his guilty plea and conduct a Kastigar hearing to challenge his indictment.  This failure continued even after June 1, 2015, the day on which he claims that he personally learned, months prior to sentencing, of the government's alleged misconduct.  The closest he came to doing so was a letter Scott wrote to the district court dated September 2, 2015, which was filed under seal and which Scott included in a sealed appendix on appeal.  In his briefing before this court, Scott characterized his letter to the district court as expressing regret that he had entered a guilty plea "in light of the Grand Jury testimony."  But

impact on our analysis, we apply the waiver language used in Cordero.

- 10 -

plainly, the letter reflects that Scott did not characterize his plea as involuntary and, more importantly, did not make a request to withdraw his plea pursuant to Rule 11(d).  See Fed. R. Crim. P. 11(d)(2)(B).  Nor did he subsequently move for withdrawal.  At sentencing, neither Scott nor his attorney mentioned the September letter or moved to withdraw Scott's plea.  Understandably, the district court did not sua sponte construe Scott's letter as a motion to withdraw his plea and did not address the issue in any way.  Under these circumstances, Scott did not do enough to raise in the district court an argument that his plea was involuntary on the grounds that it was obtained by misrepresentation.  See United States v. Souza, 749 F.3d 74, 81 (1st Cir. 2014) (finding that the defendant failed to preserve an argument regarding the exclusion of specific pretrial time periods for speedy trial purposes where the defendant's pro se filing "comprised vague complaints of delay and accusations against the court, the government, and his attorneys").

Nor did Scott have any good reason for failing to raise in the district court the argument that he presses on appeal.  To the contrary, both Scott and his counsel knew before sentencing precisely what they now say demonstrates the government's misrepresentation.  We therefore review Scott's argument only for plain error.  Fed. R. Crim. P. 52(b).  In so stating, we acknowledge that we have previously suggested (albeit not held)

- 11 -

that de novo review is appropriate when a defendant claims he was misled into pleading guilty. See Sotirion v. United States, 617 F.3d 27, 34 n.6 (1st Cir. 2010) (citing United States v. Goodson, 544 F.3d 529, 539 n.9 (3d Cir. 2008) for the proposition that de novo review applies to a defendant's claim that he was misled into signing a plea agreement containing an appellate waiver even where he did not object in the district court). Nothing in that dicta, though, considered what standard of review applies where the defendant learns of a claimed misrepresentation prior to sentencing. Subsequently, we stated that "we have yet to decide" the applicable standard of review, Castro-Vazquez, 802 F.3d at 31-32. Most recently, we reviewed only for plain error an unpreserved argument that a plea was the result of a promise by counsel to argue a point that counsel did not argue. See United States v. Tanco-Pizarro, 873 F.3d 61, 64 (1st Cir. 2017). Without foreclosing the possibility of de novo review for certain other claims of involuntariness, we see no good reason to encourage a defendant who is aware of an alleged misrepresentation to sit on a claim of reliance until after he sees how the sentencing goes. Cf. United States v. Vonn, 535 U.S. 55, 73 (2002) (noting that "the incentive to think and act early when Rule 11 is at stake would prove less substantial" if plain error did not apply).

To prevail under the plain error standard, Scott must make four showings: "(1) that an error occurred (2) which was

- 12 -

clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001).

So, in light of the foregoing, the first (and ultimately the only relevant) question is this: Was it clear or obvious that Scott's plea was the involuntary product of impermissible government malfeasance? In arguing that it was, Scott relies on Ferrara v. United States, 456 F.3d 278, 290 (1st Cir. 2006). Ferrara states:

> A defendant who was warned of the usual consequences of pleading guilty and the range of potential punishment for the offense before entering a guilty plea must make two showings in order to set that plea aside as involuntary. First, he must show that some egregiously impermissible conduct (say, threats, blatant misrepresentations, or untoward blandishments by government agents) antedated the entry of his plea. Second, he must show that the misconduct influenced his decision to plead guilty or, put another way, that it was material to that choice. In mounting an inquiry into these elements, a court must consider the totality of the circumstances surrounding the plea.

Id. (citations omitted). Scott does not argue that the district court failed to warn him of the consequences of pleading guilty or of the range of potential punishment. Our analysis is therefore limited to determining whether he has clearly made the two showings required to prove that his plea was involuntary under Ferrara:

egregiously impermissible government conduct and a decision to plead guilty that was influenced by that conduct.

In this instance, Scott argues that the manner in which the government used and then misrepresented its use of his proffered information constituted the type of "egregiously impermissible conduct" to which Ferrara refers. To put this argument in context, we revisit the terms of the proffer agreement.

With several exceptions not relevant here, the agreement only prevented the government from using Scott's statements or other information provided by Scott "directly against him." The agreement explicitly allowed the government to "make derivative use of" and to "pursue any investigative leads suggested by[] any statements made or other information provided by" Scott. Adding belt to suspenders, the agreement further stipulated that "[a]ny evidence directly or indirectly derived from the proffer may be used against [Scott]."

The parties have long disagreed concerning the meaning and application of these terms. Two examples illustrate the nature of the disagreement. First, one of the government agents who interviewed Scott used the results of the interviews to supply the factual basis for a warrant to search the property of one of Scott's co-conspirators, James Driscoll. This search yielded records and information that inculpated Scott. Scott maintains that -- because he was the source of the information leading to

Driscoll and because his own files contained identical records -- the use of Driscoll's files during the grand jury proceeding violated the proffer agreement. The government disagrees, characterizing Driscoll's files as proper derivative evidence. Neither party secured a ruling on this point from the magistrate judge or the district court.

Second, the government used computer files obtained directly from Scott to secure a search warrant for V&L, which allowed the government to seize the same records Scott had already provided by consent. The government regarded the information gathered from V&L to be derivative of Scott's proffer. Scott disagreed, and the district court sided with him, suppressing all files seized pursuant to the March 2012 V&L search as well as those same files provided by Scott in May 2009.

With this context in mind, we turn to Scott's specific argument. He points to the government's reported representation in February 2013, implying that all the evidence it had presented to the grand jury complied with the proffer agreement. That statement was false, Scott says, pointing to a transcript of the grand jury proceedings that the government provided to his counsel two weeks before Scott pled guilty. Scott adds that he did not receive that transcript through the prison mail until three days after his plea was accepted and that, had he known that the government's case presented to the grand jury relied on proffered

statements, he would not have pled guilty. Rather, he would have known that the government likely did not have sufficient untainted evidence to convict him.

We have reviewed the transcript of the grand jury proceeding and find nothing in it that clearly puts the lie to anything later said by the government. To begin, the representation made by the government at the status conference (notably, before Scott had even filed his motion to suppress) was not plainly wrong or even unreasonable. The proffer agreement and the consent-to-search forms signed by Scott authorized very broad derivative use of Scott's statements and of evidence seized from him.[5] And given that the government at the time was openly maintaining that it could use Scott's statements to obtain a warrant for derivative evidence, the government's representation at the status conference merely reflected its present, disclosed position on the wide scope of permissible evidence. No one would have reasonably misunderstood the government's statements as

_____

[5] The consent-to-search forms stated, in relevant part:

> I have been advised of my right to refuse to consent to this search, and I give permission for this search, freely and voluntarily, and not as the result of threats or promises of any kind.
> I authorize [FBI] Agents to take any evidence discovered during this search, together with the medium in/on which it is stored, and any associated data, hardware, software and computer peripherals.

representing that it had presented to the grand jury only information that would meet Scott's narrower definition of permissible evidence, which even today seems at odds with the language of the proffer agreement.

The fact that the government turned over the grand jury transcripts to Scott's counsel two weeks before Scott pled guilty, apparently without any reluctance, belies Scott's suggestion that the government was attempting to deceive him until he entered a plea and was sentenced. Moreover, this is by no means a case in which the government played hide-and-seek with exculpatory evidence. Cf. Ferrara, 456 F.3d at 292 (finding egregiously impermissible government conduct where the prosecutors failed to inform the defendant of a key witness's "plainly exculpatory" recantation and pressured the witness to testify according to his original story).

The examples listed in Ferrara -- threats, blatant misrepresentations, or untoward blandishments -- make clear that the government conduct must be "particularly pernicious," id. at 291, not merely "simple neglect," id., or "garden-variety" error, id. at 293. We see no sign here, and certainly no clear sign, of anything particularly pernicious. Ferrara also establishes that, absent egregious misconduct, "a defendant's misapprehension of the strength of the government's case" does not render his plea involuntary. Id. at 291; see also United States v. Lara-Joglar,

400 F. App'x 565, 567 (1st Cir. 2010) (relying on Ferrara for the proposition that a defendant's "assessment of the prosecution's case . . . cannot form the basis for a finding of involuntariness"); cf. United States v. Allard, 926 F.2d 1237, 1243 (1st Cir. 1991) ("[T]he defendant may not later renege on the [plea] agreement on the ground that he miscalculated or belatedly discovered a new defense."). Contrary to Scott's assertions, that is all we have here; at most, Scott may have incorrectly presumed that the government's admissible evidence was stronger than it actually was. But this is not a basis for treating his plea as involuntary.

Scott's remaining argument does not persuade us otherwise. Scott contends that the government engaged in misconduct when it decided to continue prosecuting his case after the district court granted Scott's motion to suppress. But Scott cites no authority for the proposition that any implicit representation in the government's decision to proceed with the case could even qualify as a misrepresentation. Even if it did, it would simply not rise to the level of government misconduct addressed in Ferrara.

Because Scott cannot show clearly egregious government conduct in this case, we need not address the second Ferrara prong -- whether the government's conduct was material to the decision to plead guilty. Nor need we consider the remaining prongs of the

plain error test.  To the extent Scott raises other challenges to his conviction unrelated to voluntariness, these arguments are waived as a result of his unconditional guilty plea.  We therefore affirm Scott's conviction.

## B.

In addition to his challenge regarding the proffer agreement, Scott also challenges his 135-month sentence.  "We review federal criminal sentences imposed under the advisory Guidelines for abuse of discretion."  United States v. Villanueva Lorenzo, 802 F.3d 182, 184 (1st Cir. 2015); see also Gall v. United States, 552 U.S. 38, 51 (2007).  In doing so, we engage in a two-step process:  "First, we evaluate the procedural soundness of the sentence; second, we assay its substantive reasonableness."  United States v. Madera-Ortiz, 637 F.3d 26, 30 (1st Cir. 2011).  Scott challenges both the procedure and the substance of his sentence.

## 1.

Scott argues that the district court committed two procedural errors.  First, Scott argues that the district court improperly calculated the Sentencing Guidelines range because it wrongly included five properties in the loss calculation known to the government only through statements Scott made in proffer sessions. The Guidelines are clear that, absent certain exceptions not relevant here, information collected pursuant to a proffer

agreement "shall not be used in determining the applicable guideline range." U.S.S.G. § 1B1.8(a).

We need not decide whether the court erred in finding at sentencing that the government had "pointed to sufficient independent sources" to justify the consideration of the five properties because even if it did, Scott suffered no prejudice. See United States v. Alphas, 785 F.3d 775, 780 (1st Cir. 2015) ("[R]esentencing is required if the error either affected or arguably affected the sentence."). The five properties Scott challenges had a loss amount of $1,119,050. The total loss amount for which Scott was found liable by the district court was $11,374,201.64. So even setting aside the five properties in question, Scott would still find himself comfortably within the range of $9,500,000 to $25,000,000 in total losses, which elicits the same offense level increase of twenty. U.S.S.G. § 2B1.1(b)(1)(K)-(L). Because the inclusion of the five properties had no impact on Scott's total offense level, and because Scott has not challenged the amount of restitution ordered, we cannot say that any error below "affect[ed] the district court's selection of the sentence imposed." Williams v. United States, 503 U.S. 193, 203 (1992).

We also note that the district court gave Scott "the benefit of the doubt" regarding the loss calculation, by reducing the loss-related increase from twenty levels to eighteen. This

further supports the conclusion that Scott was not harmed by the court's consideration of the five disputed properties.

Scott's second claim of procedural error is that the district court failed to adequately explain its reasons for Scott's sentence, which in Scott's view is excessive and does not reflect the circumstances of his offense. Although Scott presents this argument in his opening brief as one relating to the substantive reasonableness of his sentence, we address it as a procedural challenge. See Gall, 552 U.S. at 51 (listing failure to consider section 3553(a) factors and failure to adequately explain the chosen sentence as examples of procedural errors).

Scott concedes that the district court "explain[ed] in detail its GSR calculation, fully describing why it added each enhancement." Nevertheless, Scott maintains that the district court erred by failing to explain how it applied the section 3553(a) factors. We reject this argument. The district court stated, immediately prior to imposing Scott's sentence, that it had considered the section 3553(a) sentencing factors. We have held that "[s]uch a statement 'is entitled to some weight,'" especially where, as here, the court imposes a within-the-range sentence. United States v. Vega-Salgado, 769 F.3d 100, 105 (1st Cir. 2014) (quoting United States v. Clogston, 662 F.3d 588, 592 (1st Cir. 2011)). The district court in this case went even further in justifying the sentence it imposed, stating that it

"adopt[ed] the reasons advanced by [the government]" at the sentencing hearing, which included the seriousness of Scott's crime, the sentences imposed on similar defendants in other mortgage fraud cases, and the need to deter Scott and others from pursuing similar crimes. The court also expressed its disappointment that Scott chose to use his "obvious intelligence and ability" to enrich himself at the ultimate expense of individuals in "the most vulnerable neighborhoods of Boston." Given the district court's "lightened burden" to explain the within-the-range sentence imposed on Scott, see United States v. Pérez, 819 F.3d 541, 547 (1st Cir. 2016), this explanation was more than sufficient.

**2.**

We turn now to the substance of Scott's sentence. A defendant, like Scott, who seeks to challenge as unreasonable a within-the-range sentence carries a "heavy burden." United States v. Pelletier, 469 F.3d 194, 204 (1st Cir. 2006). While we do not presume such a sentence to be reasonable, "it requires less explanation than one that falls outside the GSR." Madera-Ortiz, 637 F.3d at 30. "[A] defendant would usually have to adduce fairly powerful mitigating reasons and persuade us that the district judge was unreasonable in balancing pros and cons despite the latitude implicit in saying that a sentence must be 'reasonable.'" United States v. Navedo-Concepción, 450 F.3d 54, 59 (1st Cir. 2006).

Scott cannot make this showing. Notably, Scott was sentenced not only within the applicable guidelines range, but at the very bottom of that range. Nevertheless, Scott argues that his sentence is substantively unreasonable because it is disproportionate to the sentences imposed on his co-defendants and others involved in the mortgage fraud scheme. Scott, though, fails to "compare apples to apples." United States v. Reyes-Santiago, 804 F.3d 453, 467 (1st Cir. 2015). Co-defendants Fowler and Raetz, both of whom were given 24-month sentences, "were not connected to all the properties at issue." According to Scott, Driscoll "appears to not have been prosecuted at all." And Anderson, who was also sentenced to 24 months in a separate case, was a real estate attorney who assisted during the properties' closings. In contrast, Scott was found to be an organizer of the entire scheme. Because Scott has not "isolate[d] 'identically situated' co-defendants" to demonstrate a sentencing disparity, there is no basis for concluding that his sentence was unreasonable. Id. (quoting United States v. Rivera-Gonzalez, 626 F.3d 639, 648 (1st Cir. 2010)).

## III. Conclusion

Finding no reason to upset Scott's conviction and sentence, we affirm.